946 A.2d 463

STATE of Maryland

v.

Maouloud BABY.

No. 14, Sept. Term, 2007.

Court of Appeals of Maryland.

April 16, 2008.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for petitioner/cross-respondent.

Michael R. Malloy, Asst. Public Defender (Nancy S. Forster, Public Defender), on brief, for respondent/cross-petitioner.

Lisae C. Jordan, Sexual Assault Legal Institute, Maryland Coalition Against Sexual Assault, Silver Spring, L. Tracy Brown, Danielle R. Cover, Women's Law Center of Maryland, Towson, for petitioner/cross-respondent.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (Retired, specially assigned) and DALE R. CATHELL, (Retired, specially assigned), JJ.

Opinion by BATTAGLIA, J., which GREENE and CATHELL, JJ., join; HARRELL, J., joins Part I; BELL, C.J., joins Part II.

The case *sub judice* presents this Court principally with the task of determining whether it was error for a trial court, during a rape trial, to respond to jury questions concerning the effect of post-penetration withdrawal of consent by referring the jury to previously provided instructions on the ele-

ments of first degree rape, without further clarification. The second issue we address is whether, regardless of any error by the trial court in instructing the jury as to the elements of first degree rape, Appellee's, Maouloud Baby's, convictions for first degree and third degree sexual offense, based on his conduct as principal in the second degree to the criminal, sexual conduct of his friend, should be reversed. Additionally, we have been asked to determine whether it is error for a trial court to fail to conduct an inquiry into the reliability and validity of expert testimony on "rape trauma syndrome" under the standard articulated in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978).

In Part I of this Court's opinion, joined by Judges Harrell, Greene and Cathell, we conclude that the trial court did err by failing to more specifically instruct the jury on post-penetration withdrawal of consent, and that the crime of first degree rape includes post-penetration vaginal intercourse accomplished through force or threat of force and without the consent of the victim, even if the victim consented to the initial penetration. In a concurrence, Judge Raker, joined by Chief Judge Bell and Judge Wilner, explains why they join only in the judgment on this issue. In Part II, joined by Chief Judge Bell and Judges Greene and Cathell, we determine that the convictions for first degree and third degree sexual offense should be reversed. A dissent by Judge Raker, joined by Judges Harrell and Wilner, reveals why they are unable to subscribe to Part II of the Court's opinion. Additionally, this Court is unanimous in suggesting, for guidance at the new trial, that "rape trauma syndrome" evidence should first be subjected to *Frye–Reed* analysis, were an appropriate objection interposed.

## Facts and Procedural History

In December 2003, Appellee, Maouloud Baby, was indicted for first degree rape,[1] first degree sexual offense,[2] attempted

1. Baby was charged with two counts of rape in the first degree under Section 3–303 of the Criminal Law Article, Maryland Code (2002), which states in relevant part:

first degree sexual offense,[3] conspiracy to commit first degree rape, and third degree sexual offense.[4] Baby was initially tried in the Circuit Court for Montgomery County in 2004, but a mistrial was declared because of a hung jury. Baby was retried on December 13–17 and 20–21, 2004 before a jury on two counts of first degree rape, one count of attempted first degree rape, one count of first degree sexual assault, one count of attempted first degree sexual offense, one count of conspiracy to commit first degree rape, and two counts of

(a) *Prohibited.*—A person may not:
(1) engage in vaginal intercourse with another by force, or the threat of force, without the consent of the other; and

        \*      \*      \*

(iv) commit the crime while aided and abetted by another. . . .
The current Section 3–303 of the Criminal Law Article, Maryland Code (2002, 2007 Supp.), is substantively similar to the 2002 version.

2. Baby also was charged with one count of sexual offense in the first degree under Section 3–305 of the Criminal Law Article, Maryland Code (2002), which states in relevant part:
(a) *Prohibited.*—A person may not:
(1) engage in a sexual act with another by force, or the threat of force, without the consent of the other; and

        \*      \*      \*

(2) (iv) commit the crime while aided and abetted by another.
. . .
The current Section 3–305 of the Criminal Law Article, Maryland Code (2002, 2007 Supp.), is substantively similar to the 2002 version.

3. Baby was charged with one count of attempted sexual offense in the first degree under Section 3–311(a) of the Criminal Law Article, Maryland Code (2002), which states, "A person may not attempt to commit a sexual offense in the first degree." The current Section 3–311(a) of the Criminal Law Article, Maryland Code (2002, 2007 Supp.), is substantively similar to the 2002 version.

4. Baby was charged with two counts of sexual offense in the third degree under Section 3–307 of the Criminal Law Article, Maryland Code (2002), which states in relevant part:
(a) *Prohibited.*—A person may not:
(1) (i) engage in sexual contact with another without the consent of the other; and

        \*      \*      \*

4. commit the crime while aided and abetted by another. . . .
The current Section 3–307 of the Criminal Law Article, Maryland Code (2002, 2007 Supp.), is substantively similar to the 2002 version.

third degree sexual offense. He was convicted of one count of first degree rape, one count of first degree sexual offense, and two counts of third degree sexual offense.

At trial, the complaining witness ("J.L.")[5] testified that on the night of December 13, 2003, she and her best friend, Lacey, went to Best Buy and purchased CDs and then drove in J.L.'s car to the McDonald's restaurant in Montgomery Village. Inside the McDonald's, they encountered some of Lacey's brother's friends, including Baby and Mike. J.L. recognized Baby from high school but did not otherwise know him.

J.L. further testified that she and Lacey left the McDonald's, went outside, and entered J.L.'s car, at which time Mike asked J.L. if she could give him and Baby a ride to a party. J.L. agreed, and allowed Baby, Mike, and an unidentified "Hispanic boy," to ride in the back seat of the car. On the way to the party, Baby instructed J.L. to stop at a gas station, which she did, where Baby and the Hispanic boy got out of the car. Although Baby returned to the car approximately one minute later, the Hispanic boy did not return.

J.L. said that the remaining four continued to drive to the party, which took approximately ten to fifteen minutes. Baby and Mike decided not to attend the party. J.L. stated that she drove back to the McDonald's, planning to drop Baby and Mike off there. During the trip back to the restaurant, Baby told J.L. to turn into a residential development and directed her to a parking spot. All four alighted from the vehicle and walked towards a clearing between two end townhouses. Baby and Mike smoked marijuana and engaged J.L. and Lacey in conversation. Baby and Mike discussed getting a hotel room, noting that J.L. and Lacey were both 18 and old enough to do so. Neither J.L. nor Lacey expressed interest.

---

**5.** The State requested that the Court of Special Appeals refer to the complaining witness as J.L. and the intermediate appellate court granted that request. We shall continue this designation.

J.L. further testified that, after the four returned to the McDonald's, Lacey left the group, but Baby and Mike stated that they did not want to leave the car. Lacey gave J.L. her cell phone, which she placed on the passenger seat. J.L. agreed to drive Baby and Mike to a residential neighborhood. Upon their arrival, she parked her car, whereupon Baby and Mike asked J.L. to sit between them in the back seat so they could talk. J.L. climbed into the back seat and sat between the two. She removed her jacket because she was warm. Baby then put his hand between her legs and Mike tried to put J.L.'s hand down his pants. Baby told J.L. to "flash him" and Mike told her to "just lick it." When J.L. did not comply with their requests, Baby began to fondle her breast with his hand.

J.L. also testified that she told Baby and Mike that they had to return to the McDonald's, but they asked to stay ten more minutes. J.L. then "somehow ended up on [her] back," at which point Baby attempted to remove her pants and Mike tried to place his penis in her mouth. J.L. told them to stop, but Baby and Mike moved her around so that her body was against Baby. Baby then held her arms as Mike attempted to have intercourse, briefly inserting his penis mistakenly into her rectum. Mike again unsuccessfully attempted intercourse, and Baby inserted his fingers into J.L.'s vagina.

J.L. further testified that Baby then got out of the car. Mike inserted his fingers and then his penis into J.L.'s vagina. Mike then left the automobile and Baby got into the car. J.L. testified that Baby told her "it's my turn now." According to J.L., the following then transpired:

Q. [ASSISTANT STATE'S ATTORNEY]: And what else did he say?

A. He, after that we sat there for a couple seconds and he was like so are you going to let me hit it and I didn't really say anything and he was like I don't want to rape you.

Q. And what did you say?

A. . . . . [W]ell first of all they told me that . . . I wouldn't be able to leave until I was done . . .

Q. They had told you that?

A. Huh?

Q. They had told you that you would not be able to leave?

A. Yes, earlier. They were just, they were like you can leave as soon as we're done.

Q. And by that you assumed what or that you understood that to mean what?

A. That as soon as I finished whatever they told me to do, I could leave.

Q. So when [Baby] said I don't want to rape you, did you respond?

A. Yes. I said that as long as he stops when I tell him to, then

—

Q. Now, that he could?

A. Yes.

Q. Now, [J.L.], at the time that [Baby] got back in the car, how were you feeling?

A. I don't know.

Q. Did you feel like you had a choice?

A. Not really. I don't know. Something just clicked off and I just did whatever they said.

Q. Were you tired?

A. Yes.

Q. Did you want to go home?

A. I just wanted to go home.

Q. Now when you told [Baby] if I say stop, something like that, you have to stop. What did he do after you spoke those words?

A. Well he got on top of me and he tried to put it in and it hurt. So I said stop and that's when he kept pushing it in and I was pushing his knees to get off me.

Q. You were on your back and he was on top of you?

A. Yes.

Q. Did he stop pushing his penis into your vagina?

A. Not right away.

Q. About how long did he continue to push his penis into your vagina?

A. About five or so seconds.

Q. And then what happened?

A. And that's when he just got off me and that's when Mike got in the car and—

Q. Let me stop you for a minute. When he was, he put himself in you and you said, ow, it hurts, stop—

A. Yeah.

Q.—did he stop?

A. No.

Q. How many times did you tell him to stop?

A. I, well I yelled stop, that it hurt, and I was pushing him off me.

Q. And he didn't stop—

A. No.

Q.—until at some point he did?

A. Yes.

J.L. also stated that Mike, without her permission, then drove the car to a neighborhood across the street from the McDonald's. During the drive, Baby asked J.L. to "jack him off" and she declined. She did give Baby her phone number when he requested it. Baby returned Lacey's cell phone to J.L., which he or Mike had taken from her previously, and J.L. used it to call Lacey. The two women spoke briefly. Mike parked the car across from the McDonald's and hugged J.L. before he and Baby departed.

J.L. then drove to the McDonald's to pick up Lacey. They then drove to Shoppers Food Warehouse, where they met J.L.'s mother to shop for groceries. After the grocery shopping, J.L. and Lacey proceeded to Lacey's home where J.L. told Lacey's mother what had occurred. The police were called, whereupon J.L. went to the hospital to be examined.

Baby also testified at trial and his testimony was similar to that of J.L., except his recollection of the events that occurred in J.L.'s car after they had dropped off Lacey at the McDonald's:

[BABY'S COUNSEL]: Before you got out of the car, did you touch [J.L.] in any way?

A. No, I didn't.

Q. Hold her?

A. No.

Q. Grab her?

A. No.

Q. Did you take your penis out before you got out of the car?

A. No, I didn't.

Q. Did you see [Mike's] penis before you got out of the car?

A. No, I didn't.

Q. Did you have any contact with [J.L.] prior to getting out of the car?

A. No contact prior to getting out of the car.

Q. What happened after you sat there for that amount of time?

A. After I sat, Mike got out of the car and, while I was walking towards the car, he told me that, he said in quote that he "just hit that," which means he just had sex with her. So, then I got in the car, and right when I sat down in the car, she was sitting on the driver's side of the car.

Q. What did that mean to you when Mike said he "just hit that"?

A. He just had sex with her.

Q. Which side did he get out?

A. He got out of the driver's side.

Q. And what side did you get in?

A. I was in the, I got in from the driver's side, too.

Q. When she was sitting there, was she dressed?

A. She didn't have nothing on but her shirt.

Q. How did she appear?

A. She appeared normal.

Q. Was she crying?

A. No, she wasn't.

Q. When you got in the car, what, if anything, did you say or do?

A. I asked her if she was going to let me have sex with her.

Q. What exactly did you say?

A. I said, "Are you going to let me hit that?"

Q. And what does that mean to you, "Can I hit that?"

A. Have sex.

Q. What, if anything, did she say?

A. She said yes, as long as I stop when she says to. And then I said, "I'm not going to rape you."

Q. Did you feel that was permission?

A. Yeah, I thought that that was permission.

Q. Why did you say "I don't want to rape you"?

A. Just to, because she said, "Stop when I say to," just to tell her that. It's kind of like to confirm the permission.

Q. So, after she said "Stop when I say stop," what did you do, if anything?

A. That's when I took off the condom, I mean, I took the condom out of my pocket and I ripped it open, I put on the condom, put the condom, threw the condom, like, on the floor, on her door, and she picked it up and told me to throw it out the window.

Q. She gave it back to you?

A. Yeah.

Q. Where was it? On the floor?

A. Yeah.

Q. Where did she pick it up from?

A. She picked it up right from the floor?

Q. Front seat or back?

A. In the backseat.

Q. How did you open it? Do you remember?

A. I don't remember how I opened it. I just tore it open.

Q. What did you do with it when she gave it back to you?

A. I threw it out the window.

Q. Was the window open, or did you have to roll it down?

A. No, I think it was open.

Q. Had you previously closed it or opened it?

A. No. I didn't touch the window the whole night.

Q. When you were putting on your condom, where was she, what position was she in?

A. She was, first she was sitting in the car when we was talking, and then she was still sitting when I put on the condom. But then after, when I was trying to go in there, she was like laying down in the car in the backseat.

Q. What did you do physically?

A. I placed myself in between her legs and then I tried to put it in.

Q. What were you wearing?

A. I was wearing a black T-shirt, blue jeans, and black sneakers.

Q. Did you take your pants all the way off?

A. No, I don't think so. I think I just zipped my pants down.

Q. Describe the black shirt.

A. Oh, it was a tall T-shirt and it was big. It was, I think it was a 3X, and it was black.

Q. What do you mean a tall T-shirt?

A. It was a shirt that runs long.

Q. What did you do with your penis?

A. I tried to put it in.

Q. Do you know where it was touching or what happened to it?

A. No. After I tried to put it in once, it wouldn't go in, and I tried a couple more times and it wouldn't go in. I didn't feel nothing there.

Q. What happened? What did she say or do?

A. And then she sat up. She was like, "It's not going to go in," and that's when, after she sat up and said "It's not going to go in," that's when I took off the condom and I put it in my pocket and then knocked on the window for Michael to come in.

Q. Who said, "It's not going to go in?" You or her?

A. She did.

Q. When she sat up, what did that mean to you?

A. That meant stop.

Q. Did she say "Stop"?

A. No, she didn't. She just sat up.

Q. And you took that to mean stop?

A. Yeah.

Q. When she sat up, did you try to put it in again?

A. No, I didn't.

Testifying on behalf of the State was Dr. Ann Burgess, a Professor of Nursing at Boston College, who holds a master's of science degree in psychiatric nursing from the University of Maryland and a doctor of nursing science degree from Boston University. Dr. Burgess' testimony was offered as an expert on the subject of "rape trauma syndrome," to which Baby's attorney objected, having filed a motion *in limine* to exclude Dr. Burgess' testimony. At trial, the State presented Dr. Burgess with behaviors such as offering "minimal, physical resistance" in response to the assailant's actions, not immediately telling the first person the victim saw about the rape "even if that person might be their best friend," and engaging in routine behavior such as "going to a supermarket and shopping" shortly after the rape and asked if these behaviors were consistent with "rape trauma syndrome." Dr. Burgess testified that such behaviors were consistent with "rape trauma syndrome," as were other actions, such as not calling 911

immediately and giving one's telephone number to the assailant.

The trial court instructed the jury on the elements of first degree rape, using language substantively similar to that in the pattern jury instructions.[6] After the jurors began deliberation, they initially submitted two notes which related to the duration of their discussion. A short time later, the jury submitted a third note which was read into the record: "If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the man continues until climax, does the

---

**6.** The instructions provided to the jury were, in pertinent part:

The next definition I am going to give you is second-degree rape, and I believe, if you look at the verdict sheet, he is not actually charged with second-degree rape, but the charge relates to first-degree rape. But in order to understand what first-degree rape is, you start with second-degree rape. I just wanted you to know why you are getting that definition even though that is technically not one of the charges. All right. Rape is unlawful vaginal intercourse with a female by force or threat of force and without her consent. In order to convict the defendant of second-degree rape, the State must prove that the defendant had vaginal intercourse with [J.L.], that the act was committed by force or threat of force, and that the act was committed without the consent of [J.L.].

Vaginal intercourse means the penetration of the penis into the vagina. The slightest penetration is sufficient. An emission of semen is not required. The amount of force necessary depends upon the circumstances. No particular amount of force is required, but it must be sufficient to overcome the resistance of the victim. You must be satisfied that the victim either resisted and that this resistance was overcome by force or threat of force or that the victim was prevented from resisting by force or threat of force. She must have resisted to the extent of her ability at the time unless her resistance or will to resist was overcome by force or fear that was reasonable under the circumstances.

Finally, consent means actually agreeing to the act of intercourse rather than merely submitting as a result of force or threat of force. The actual charge is first-degree rape, and in order to convict the defendant, the State must prove all of the elements of forcible, second-degree rape, which I have just gone through with you, and must also prove that the defendant committed the offense aided and abetted by one or more additional persons. A person aids and abets the commission of a crime when he knowingly and intentionally associates with the criminal venture with the intent to help commit the crime and seeks, by some act, to make the crime succeed.

result constitute rape?" Baby's attorney argued that the court should respond to the note in the negative:

> [BABY'S COUNSEL]: ... To me, the clear answer, the unequivocal answer to this questions is no. Why? Because they ask, "If a female consents to sex initially and, during the course of the sex act to which she consented—" That means that the woman consented to the penetration. She consented to the penis going into her vagina.

> The State argued that any slight intrusion into the vagina is rape. Here, this woman in the note consented to sex and allowed a penis to go into her vagina. This is during the sex act. During the sex act, the man ejaculates, but the penis is inside of her when you read the note. To me, the clear answer to this question is no because she consented to the male penetration. It is in her by consent.

> THE COURT: Let me say this. That is what you are assuming this note means, but I don't know that that is what it means. That is the problem.

> [BABY'S COUNSEL]: Well, it says—

> [ASSISTANT STATE'S ATTORNEY]: No.

> [BABY'S COUNSEL]:—she consents to sex initially—

> THE COURT: What does that mean?

> [BABY'S COUNSEL]:—and during the course of the sex act, she changes her mind, which means she is having sex—

> THE COURT: That is what you think it means, but I don't know that that is what it means—

> [ASSISTANT STATE'S ATTORNEY]: Right.

> THE COURT:—that is the problem. I am going to have to, I think, respond that I am unable to answer their question as posed and that they should reread the instructions as to—

> [ASSISTANT STATE'S ATTORNEY]: The elements, read the instructions.

> THE COURT:—as to the element of each offense.

[ASSISTANT STATE'S ATTORNEY]: Well, and "consent," Your Honor, is specifically defined in that instruction. It means actually agreeing rather than merely submitting. THE COURT: To an extent, it is almost like it is a factual question that they want us to answer for them. It is really a factual question as opposed to a legal question, it seems to me.

All right. How is this: "I am unable to answer this question as posed. Please reread the instructions as to each element and apply the law to the facts as you find them"? [BABY'S COUNSEL]: Judge, it seems to me the note indicates that the female in the note consented to penetration.

THE COURT: I hear you, but I don't think that is an absolute. I don't think you can necessarily know what they mean by that note. That is the problem. They have to decide the facts, apply the law to the facts.

The following morning, the jury submitted another note which read, "If at any time the woman says stop is that rape?" Baby's counsel requested that the court provide the jury with "the exact answer that you gave to the note last night." The court replied, "Right. This is the same question in simpler form or at least a variation of the same question." The court then instructed the jury, "This is a question that you as a jury must decide. I have given the legal definition of rape which includes the definition of consent."

On December 21, 2004, the jury found Baby guilty "[a]s to Count I, First Degree Rape (Being aided and abetted by [Mike] in the act of vaginal penetration)," guilty "[a]s to Count II, First Degree Sexual Assault (Aiding and abetting [Mike] in the act of anal penetration)," guilty "[a]s to Count V, Third Degree Sexual Offense (touched vagina)," and guilty "[a]s to Count VI, Third Degree Sexual Offense (touched breast)." The jury found Baby not guilty of one count of first degree rape, of one count of attempted first degree sexual offense, and of one count of conspiracy to commit first degree rape. On February 17, 2005, Baby was sentenced to fifteen years

imprisonment, with all but five years suspended, and five years probation upon release.[7]

Baby noted an appeal to the Court of Special Appeals. He argued that the circuit court erred in refusing his request to instruct the jury that it should return a verdict of not guilty of rape if it was persuaded that the complaining witness consented to sexual intercourse, but withdrew her consent after penetration; that the circuit court erred by denying Baby's request to remove a juror who indicated that he had read a newspaper article about the case; and that the circuit court erred in denying Baby's motion *in limine* to exclude Dr. Burgess' testimony concerning "rape trauma syndrome." In a reported opinion, the Court of Special Appeals reversed Baby's convictions, holding that the trial court erred in refusing to answer the questions submitted to the jury regarding whether a sex act initially consented to by the complaining witness can constitute rape if she withdraws consent after penetration has occurred. The intermediate appellate court also held, based upon its interpretation of the English common law that informed the statutory definition of rape, and consistent with language in *Battle v. State*, 287 Md. 675, 684, 414 A.2d 1266,1270 (1980),[8] that if a woman "consents [to sexual intercourse] prior to penetration and withdraws the consent

---

7. Baby was sentenced to fifteen years on Count I (rape in the first degree), with all but five years suspended; fifteen years on Count II (sexual offense in the first degree), with all but five years suspended, to run concurrent to the sentence on Count I; ten years on Count V (sexual offense in the third degree), with all but five years suspended, to run concurrent to sentences on Counts I and II; and ten years on Count VI (sexual offense in the third degree), with all but five years suspended, to run concurrent to sentences on Counts I, II, and V.

8. In *Battle v. State*, 287 Md. 675, 684, 414 A.2d 1266, 1270 (1980), this Court stated that:

> Given the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse. On the other hand, ordinarily if she consents prior to penetration and withdraws the consent following penetration, there is no rape.

following penetration, there is no rape." *Baby v. State,* 172 Md.App. 588, 617, 916 A.2d 410, 427 (2007). Additionally, the Court of Special Appeals decided that the trial court did not err when it allowed Dr. Burgess to testify as an expert witness on the subject of "rape trauma syndrome." *Id.* at 632, 916 A.2d at 435–36. The intermediate appellate court also determined that the trial court had properly exercised its discretion in waiting until the jury began deliberations to excuse a juror who had read a newspaper article about the case, but who had not shared what he read with any of the other jurors. *Id.* at 628, 916 A.2d at 433.

Thereafter, the State filed a Petition for Writ of Certiorari, raising the following two questions for our review:

1. If a woman initially consents to vaginal intercourse, withdraws consent after penetration, and then is forced to continue intercourse against her will, is she a victim of rape?

2. Regardless whether the trial court erred in its answers to the jury's questions, did the Court of Special Appeals err in reversing Baby's convictions for first degree sexual offense and third degree sexual offense, which were unrelated to the subject matter of the jury's questions? [9]

Baby filed a Conditional Cross–Petition for Writ of Certiorari, presenting this Court with the following additional two questions:

1. Did the trial court err by denying Respondent's motion *in limine* to exclude, and his objection to, the testimony of Ann Burgess, who was offered by the State as an expert witness on "rape trauma syndrome" and related matters?

2. Did the trial court err by refusing to remove a juror from the jury at the point when the juror admitted having read a newspaper article about Respondent's case? [10]

---

9. During the course of oral arguments, the question arose as to whether the victim really ever had consented to vaginal intercourse. This issue is not before us, however.

10. Because we are remanding for a new trial on other grounds, we need not reach this issue and decline to do so.

We granted the Petition for a Writ of Certiorari, as well as the Conditional Cross-Petition. *State v. Baby,* 399 Md. 33, 922 A.2d 573 (2007).

## Discussion

The State contends that the Court of Special Appeals erred in concluding that the circuit court abused its discretion in refusing to directly address the two jury questions asking whether an individual could be guilty of rape if the complaining witness initially consented to intercourse, but withdrew her consent after penetration. The State primarily argues that this Court's decision in *Battle,* 287 Md. at 675, 414 A.2d at 1266, should not have been relied upon by the Court of Special Appeals to draw its conclusion that post-penetration withdrawal of consent, coupled with continuation of intercourse through force or threat of force, is not sufficient to constitute the elements required for a finding of rape. The State contends that the relevant language in *Battle,* that "[o]n the other hand, ordinarily if [a woman] consents prior to penetration and withdraws the consent following penetration, there is no rape" was dicta and therefore should not have been granted precedential value. Alternatively, the State argues that if we hold that the language in *Battle* is not dicta, or otherwise determine that the common law continues to define Maryland's modern rape law, and likewise find that the common law of rape does not criminalize continuation of sexual intercourse through force or threat of force after the victim has withdrawn her consent, then that aspect of the common law should be rejected as it is based on an obsolete view of the crime of rape, is inconsistent with existing Maryland law, and has been rejected by a majority of States that have considered the issue. The State additionally argues that the instructions provided by the court and used by the jurors accurately reflected Maryland law. The State also argues that, regardless of whether the trial court committed error in its answers to the jury's questions, the Court of Special Appeals was mistaken in reversing Baby's convictions for first degree and

third degree sexual offense, as they were unrelated to the subject matter of the jury's questions.

In response to the State's contentions, Baby argues that the language in *Battle* was not dicta and was properly relied upon by the Court of Special Appeals. Baby further contends that the language in *Battle* was consistent with the English and American common law and the common law definitions of the basic elements of rape continue to govern prosecutions for rape. Baby additionally argues that the rule expressed in *Battle* is adequate and does not need to be changed, that the rule proposed by the State would be defective, and that if this Court were to adopt a new rule it should not apply retrospectively to the instant case. Baby also contends that, even if we were to find that a rule on post-penetration different than that articulated in *Battle* was applicable at Baby's trial, the trial court still committed error in its reference to the pattern instructions, which was not an adequate response to address the jury's confusion about the significance of post-penetration withdrawal of consent. Baby responds to the State's contention that the Court of Special Appeals should not have reversed the charges for first and third degree sexual offense by arguing that the intermediate appellate court could not have found beyond a reasonable doubt that the trial court's error in no way influenced the jury's verdicts. Baby additionally argues that the Court of Special Appeals correctly suggested that the jury could have been seeking clarification about the withdrawal of consent on all the counts for which it later convicted Baby.

Baby contends in his cross-petition that the circuit court erred in admitting the testimony of Dr. Burgess as an expert on "rape trauma syndrome." Baby argues that the reliability of rape trauma evidence has not been established and that the trial court should have conducted a hearing to determine whether the testimony met the *Frye–Reed* test for general acceptance in the scientific community. Baby additionally argues that Dr. Burgess failed to clearly define the nature and limits of "rape trauma syndrome," that she did not have an adequate basis for her opinions, and that she improperly

rendered an opinion that J.L. had been raped. Lastly, Baby argues that the trial court erred in allowing the use of the term "rape trauma syndrome" as the phrase is prejudicial because it implies that the symptoms could only have been produced by rape.

In response to Baby's contentions, the State argues that the trial court properly exercised its discretion in allowing Dr. Burgess' testimony to show lack of consent and explain behavior that might appear inconsistent with being a victim of rape. The State contends that Dr. Burgess was highly qualified to testify as an expert witness on both "rape trauma syndrome" and post-traumatic stress disorder ("PTSD"). The State additionally argues that Dr. Burgess did not express any opinion about J.L., that the testimony was not admitted to prove that a rape occurred, and that Dr. Burgess' testimony about "rape trauma syndrome" and PTSD removed the prejudicial effect of the former term. The State also contends that Baby's argument that "rape trauma syndrome" is not accepted as valid by the scientific community was not preserved as it was not previously raised in his motion *in limine* or objections at trial, nor in his briefs before the Court of Special Appeals or Cross–Petition for Writ of Certiorari before this Court. The State additionally argues that this Court has recognized the evidentiary value of "rape trauma syndrome," citing to our language in *Hutton v. State*, 339 Md. 480, 504, 663 A.2d 1289, 1301 (1995) that "[e]xpert testimony describing PTSD or rape trauma syndrome may be admissible, however, when ... offered, for example, to show lack of consent or to explain behavior that might be viewed as inconsistent with the happening of the event."

Because of a divergence of views regarding the issues presented in this case, we clarify our holdings as follows. In Part I, we conclude that the crime of first degree rape includes post-penetration vaginal intercourse accomplished through force or threat of force and without the consent of the victim, even if the victim consented to the initial penetration, such that our pronouncement in *Battle* was dicta. Thus, we hold that Baby's rape conviction should be reversed because

the trial court erred by failing to more specifically instruct the jury on post-penetration withdrawal of consent by referring the jury to previously provided instructions on the elements of first degree rape, without further clarification. In Part II, we hold that Baby's convictions for first degree and third degree sexual offense, based on his conduct as principal in the second degree to the criminal, sexual conduct of his friend, Mike, should be reversed.

Additionally, for guidance at the new trial, we suggest that "rape trauma syndrome" evidence should first be subjected to *Frye–Reed* analysis, were an appropriate objection interposed.

## I. The Rape Conviction and the Jury Instruction

In this case, the Court of Special Appeals held that if a woman "consents [to sexual intercourse] prior to penetration and withdraws the consent following penetration, there is no rape." *Baby,* 172 Md.App. at 617, 916 A.2d at 427. In so concluding, the intermediate appellate court relied on what it characterized as a holding in *Battle,* 287 Md. at 675, 414 A.2d at 1266, and determined that it was a correct statement of the common law of rape.

In *Battle,* the victim met John Battle when she parked her car at a service station near the Pimlico Race Track. When she returned to her car after visiting the Track, she discovered that Battle, who was in charge of parking, had washed her car. Upon learning that she did not have any money to pay him, Battle suggested that she "drive [him] past home" and told her where he lived. *Id.* at 677, 414 A.2d at 1267 (alteration in original). She informed him that she did not have enough gas to do so, and he provided her with a couple of dollars with which to purchase fuel. She testified that on the way to his home they discussed a radio that he wanted to sell, and she accepted his invitation to examine the radio and determine if she wanted to purchase it.

Upon reaching his home, she accompanied Battle upstairs to his room to look at the radio. She testified that once they were upstairs he struck her and ordered her to remove her

clothing. She responded "You got to be kidding," but he pulled a screwdriver from his pocket and put it against her head and again ordered her take off her clothes. *Id.* She testified that "he said he would kill me because he killed one time and he said he would kill again." *Id.* In fear for her safety, she took off her clothes, got in bed with him, and had vaginal intercourse.

While she and Battle were having intercourse, a persistent knocking was heard at the downstairs door. The victim testified that when Battle went to answer the door, she went to a room across the hall from his bedroom and attempted to summon help. She stated that "I was getting ready to get out of the window on the roof and he came in and caught me and pulled me back in and hit me." *Id.* at 678, 414 A.2d at 1267. Battle then dragged her back into bed and disrobed himself and her. There was again the sound of someone at the door; when Battle answered the door, the victim was able to attract the attention of some nearby children who summoned the police to rescue her.

Conversely, Battle testified that the victim asked him to have sexual intercourse with her. He said that he found her disrobed in his bedroom but denied that any sexual contact occurred.

After a period of deliberation, the jury addressed a written question to the trial judge, asking: "When a *possible* sexual consensual relationship becomes non-consensual for some reason, during the course of the action—can the act then be considered rape?" *Id.* at 678, 414 A.2d at 1268 (emphasis in original). Because the trial judge was not certain that she understood the question, she inquired of the jury whether the question asked was "where the original act of sex is by consent whether is it then possible the circumstances could change because of the victim's lack of consent after the original situation began as a consensual one," and the jury replied that that was what was meant. *Id.* The trial judge then told them, "I will answer your question by saying, 'Yes, that it is possible for a situation to start out as consensual and

then become a non-consensual one in the course of the event,' " *id.,* and continued with language taken from *Hazel v. State,* 221 Md. 464, 469, 157 A.2d 922, 925 (1960), in which this Court stated:

> With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. There is, however, a wide difference between consent and submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent.

The trial judge then added, "It is not altogether clear as to what degree of resistance is necessary to establish the absence of consent; that is a question that you ... would have to determine on the basis of the evidence that you have heard during the course of trial." *Battle,* 287 Md. at 679, 414 A.2d at 1268. She also provided additional instructions related to fear and resistance.

When counsel were asked whether they had any objection to the court's instructions, defense counsel stated that he thought that in the jury's question, "during the course of the action" referred specifically to intercourse and that once intercourse has commenced one cannot withdraw consent "and start screaming rape." *Id.* at 679–80, 414 A.2d at 1268. The State suggested that the term also could have referred to the "whole chain of events, from the time the victim got to the parking lot" or to a time after the parties "got in the bedroom or maybe after they had sex." *Id.* at 680, 414 A.2d at 1268.

In determining whether the trial court correctly responded to the jury's instruction, this Court began by stating that Maryland's statutory definition of rape [11] was an outgrowth of

---

11. The definition of first degree rape applicable at the time of *Battle* was codified in Maryland Code (1957, 1976 Repl.Vol., 1977 Supp.) Article 27, Section 462, which stated in relevant part:

the common law definition of rape interpreted in *Hazel.* We then engaged in a review of the history of rape in American common law. From our review, we concluded that "consent subsequent to the act of intercourse will not prevent its being rape." *Battle,* 287 Md. at 681, 414 A.2d at 1269.

We then turned to the question of "the effect of a withdrawal of consent prior to penetration," *id.* at 683, 414 A.2d at 1270, and considered various holdings in cases of our sister States, including those in *Wright v. State,* 23 Tenn. (4 Hum.) 194, 198 (1843) (holding that the lower court's jury instruction that it "is of no difference if the person abused consented through fear, or that she was a common prostitute, or that she assented after the fact, or that she was taken first with her own consent, if she were afterwards forced against her will" was "correct in every particular, and fully sustained by authority"); *State v. Auld,* 2 N.J. 426, 67 A.2d 175, 180 (1949) (holding that the trial court did not commit error by not instructing the jury that consent may not be withdrawn during the act of intercourse); and *State v. Allen,* 163 Kan. 374, 183 P.2d 458, 460 (1947) (holding that rape could still be found when a woman changed her mind about consenting to intercourse and the appellant resorted to force). We concluded that, "[g]iven the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse." *Battle,* 287 Md. at 684, 414 A.2d at 1270. We then continued: "On the other hand, *ordinarily* if she consents prior to penetration and withdraws the consent following penetration, there is no rape." *Id.* (emphasis added).

We held that "the combination of the ambiguous [jury] question, ambiguously clarified by the trial judge, and the

(a) *What constitutes.*—person is guilty of rape in the first degree if the person engages in vaginal intercourse:

(1) With another person by force or threat of force against the will and without the consent of the other person. . . .

answer create sufficient confusion in this case to warrant reversal and a remand for a new trial." *Id.* at 685, A.2d at 1271. Based upon our holding in *Midgett v. State,* 216 Md. 26, 139 A.2d 209 (1958), we concluded that the trial court's response to the jury question was injurious because the absence of clear definitions of the terms "situation" and "event" made it impossible to tell whether the court was discussing pre- or post-penetration withdrawal of consent, rendering the response confusing and not instructive. *Battle,* 287 Md. at 684–85, 414 A.2d at 1270–71.

The State urges us to find the language in *Battle* that, "ordinarily, if she consents prior to penetration and withdraws the consent following penetration, there is no rape" to be dicta and thus not precedential on the question of whether the continuation of intercourse with the use of force or threat of force after post-penetration withdrawal of consent constitutes rape. The State also notes that some of our sister States have themselves characterized the *Battle* language as dicta. *See State v. Siering,* 35 Conn.App. 173, 644 A.2d 958, 963 n. 8 (1994), *cert. denied,* 231 Conn. 914, 648 A.2d 158 (1994) (noting that the language in *Battle* "is arguably dicta and thus will not be addressed here"); *State v. Robinson,* 496 A.2d 1067, 1070 (Me.1985) (stating that only one North Carolina case addressed the subject of post-penetration withdrawal of consent, even though *Battle* had been decided by that time). Baby, conversely, argues that the language was in fact part of the holding in *Battle,* a position Baby argues with which the Court of Special Appeals appears to have acquiesced in its statement that, the "in-depth analysis engaged in by the Court of Appeals in *Battle* negates any notion that the pronouncement that prior consent vitiates the criminal character of the post penetration sexual act was inadvertent or mere dicta," *Baby,* 172 Md.App. at 615, 916 A.2d at 425, although the Court of Special Appeals did recognize that "[w]hether the statement at issue in *Battle* is *dicta,* however, is not the relevant question." *Id.* at 616, 916 A.2d at 425–26.

In *Carstairs v. Cochran,* 95 Md. 488, 499, 52 A. 601, 601 (1902), this Court noted that:

It may be difficult to frame a concise definition of an "obiter dictum" ... and some courts incline to the rule that the most deliberate expression of opinion, upon a question distinctly raised in the record, and fully argued by counsel, may nevertheless be regarded as a dictum, unless essential to the actual disposition made of the case. But as Bouvier well says: "It is difficult to see why, in a philosophic point of view, the opinion of the court is not as persuasive on all the points which were so involved in the cause that it was the duty of counsel to argue them, and which were deliberately passed on by the court, as if the decision had hung upon but one point;" and in Maryland the rule is in accord with this view.

In *Schmidt v. Prince George's Hospital,* 366 Md. 535, 551, 784 A.2d 1112, 1121 (2001), Judge Glenn Harrell, writing for the Court, iterated that: "When a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum,* although the final judgment in the case may be rooted in another point also raised by the record."

Our statement in *Battle,* 287 Md. at 684, 414 A.2d at 1270, that "ordinarily, if she consents prior to penetration and withdraws the consent following penetration, there is no rape," is properly characterized as *obiter dictum* and will not be afforded precedential weight. It was not made on a point that was argued by counsel and deliberately addressed by this Court, but rather was a collateral statement. Most important is the fact that our decision in *Battle* was not dependent upon this statement; the holding would indeed be unaffected were that language to be removed.

Additionally, the sentence in issue appears to be tacked on as an articulation of the converse of the Court's previous statement, although one should note, a converse which is predicated by the term "ordinarily." That the converse is not subjected to any analysis as to its application provides further support for the proposition that it is merely *obiter dictum,* and not part of our holding in *Battle.*

The sole issue before us in *Battle* was whether withdrawal of consent before penetration, followed by vaginal intercourse accomplished through force or threat of force, constituted rape. In addressing this issue, we relied upon 19th century commentaries and an analysis of the decisions of courts in our sister States to bulwark our conclusion. The Court of Special Appeals in this case, in turn, in addressing the issue of post-penetration withdrawal of consent, appropriately looked to the common law for guidance.[12] The intermediate appellate court relied on the *Battle* analysis, and it is this reliance on our historical analysis in *Battle* as applicable to the present case, with which we disagree. It is proverbially mixing apples and oranges, because the analysis in *Battle* only addressed the withdrawal of consent before penetration and was not extensive enough to be applicable to the issue of post-penetration withdrawal of consent.

The gravamen of the distinction between our analysis in *Battle* and that of the Court of Special Appeals in this case lies in the historical importance that the intermediate appellate court placed on the notions of virginity, the harm of deflowering a virgin, and the importance of penetration to the crime of rape. Pivotal to this analysis is the Court of Special Appeals reliance on a Florida Law Review article, Ricki Lewis Tannen, *Setting the Agenda for the 1990s: The Historical Foundations of Gender Bias in the Law: A Context for Reconstruction,* 42 Fla.L.Rev. 163 (1990), for the statement that the English common law was based upon the "cultural mores" of the laws of the Old Testament and the Middle Assyrian Laws of

---

**12.** While Maryland currently possesses a statutory definition of the offense of rape, before 1976, rape was defined at common law. Since the creation of the statutory definition, we have still been called upon to look to the common law to interpret terms or elements which are not defined by statute. *See State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720, 725 (1981) (holding that the determination of whether the element of consent was proved was to be made by reference to the common law). *See also Wilson v. State,* 132 Md.App. 510, 519, 752 A.2d 1250, 1255 (2000) (interpreting the statutory definition of "vaginal intercourse" to include the common law principle that only penetration of the vulva is required).

Mesopotamia "which undergird[ed] the notion that the crime of rape was complete upon penetration" and which characterized the rape of a virgin as "an illegal trespass upon the father's property."[13]  *Baby,* 172 Md.App. at 616 n. 6, 916 A.2d at 426 n. 6. The Court of Special Appeals stated that

> it was the act of penetration that was the essence of the crime of rape; after this initial infringement upon the responsible male's interest in a woman's sexual and reproductive functions, any further injury was considered to be less consequential.  The damage—viewed from the perspective of the husband's or father's interest in the reproductive functions of the victim—was done.  It was this view that the moment of penetration was the point in time, after which a woman could never be "re-flowered," that gave rise to the principle that, if a woman consents prior to penetration and withdraws consent following penetration, there is no rape.  Maryland adheres to this tenet, having adopted the common law, which remains the law of the Land until and unless changed by the State's highest court or by statute.

*Id.* at 617, 916 A.2d at 427.

While it certainly may be the case that the common law's focus on penetration was somehow originally related to the "de-flowering" of virgins, a search of early English case law and scholarship reveals that by the time Maryland expressly adopted "the rules of the common law of England" in 1639,[14]

---

**13.**  "[A] virgin was considered a valuable asset, the value residing in men's ability to gain absolute ownership of the totality of her sexual and reproductive functions.  Any infringement upon this totality through premarital sexual relations rendered the asset less valuable, and might even turn it into a liability."  Ricki Lewis Tannen, *Setting the Agenda for the 1990s: The Historical Foundations of Gender Bias in the Law: A Context for Reconstruction,* 42 Fla. L.Rev. 163, 172 (1990).

**14.**  In *Baltimore Sun Co. v. Mayor and City Council of Baltimore,* 359 Md. 653, 661–62, 755 A.2d 1130, 1134–35 (2000), Judge Eldridge, writing for this Court, discussed the adoption of the common law.  He noted that the common law of England was adopted "as early as 1639, when the Maryland General Assembly approved the 'Act for the Liberties of the People,'" and that the "rights embodied in the Act of 1639, specifically the right to the benefits of the common law of England, are

the English law of rape had evolved beyond the understanding of rape as merely a trespass upon a man's property. Before Maryland adopted the English common law, penetration could no longer be said to represent the completion of the harm caused by rape, although it was still focused on as sufficient evidence for the required element of vaginal intercourse.

In saying thus, we begin with Bracton's 13th century treatise *On the Laws and Customs of England.*[15] In the second volume of his work, Bracton discusses the Pleas of the Crown, including an appeal called "the rape of virgins." 2 Bracton, *On the Laws and Customs of England* 414 (George E. Woodbine ed., Samuel E. Thorne trans., 1997). Bracton defines the appeal as "a crime imputed by a woman to the man by whom she says she has been forcibly ravished against the king's peace." *Id.* He noted that in "ancient times [16] the practice was as follows: If a man meets a woman or comes across her somewhere, whether she is alone or has companions, he is to let her go in peace; . . . if he lies with her, he incurs the loss of his life and his members." *Id.* at 418. Addressing the law of his own time, he described the punishment of the rape of a virgin as "the loss of members, that there be member for member, for when a virgin is defiled she loses her member and therefore let her defiler be punished in the pants in which he offended." *Id.* at 414. He goes on to clarify that, although the crime of rape was not limited to the defilement of virgins, the most severe punishment was reserved for a violation of a virgin:

---

presently embodied in Article 5 of the Maryland Declaration of Rights, originally enacted in August 1776."

**15.** Sir Matthew Hale places Bracton's writing during the time of King Henry III of England, who ruled from 1216 to 1272. *See* 1 Matthew Hale, *The History of the Pleas of the Crown* 627 (Sollom Emlyn ed., 1847).

**16.** Bracton qualifies "ancient times" by citing to the Saxon King Athelstan, who ruled in the 10th century. *See* 2 Bracton, *On the Laws and Customs of England* 418 (George E. Woodbine ed., Samuel E. Thorne trans., 1997).

> Punishment of this kind does not follow in the case of every woman, though she is forcibly ravished, but some other severe punishment does follow, according as she is married or a widow living a respectable life, a nun or matron, a recognized concubine or a prostitute plying her trade without discrimination of person, all of whom the king must protect for the preservation of his peace, though a like punishment will not be imposed for each.

*Id.* at 415 (footnote omitted).

From Bracton's commentary, we find that as early as the time of Henry III, English law had gone beyond the ancient focus on virgins as property of their fathers or husbands to recognize that any woman, regardless of whether a virgin, could be a victim of rape, although the punishment for the crime would vary. *See id.* While at the time of Bracton's writing the name of the offense still reflected its origin in the protection of a woman's chastity, some form of punishment was available to any woman "forcibly ravished," even if she be "a recognized concubine or a prostitute." *Id.*

Further evidence that the English common law criminalized the rape of any woman, regardless of whether she was a "deflowered" virgin, is found in the writings of Sir Matthew Hale. In his *The History of the Pleas of the Crown,* Hale reviews the history of rape in the English law and traces the transformation of the punishment for rape:

> Rape was anciently a felony, as appears by the laws of *Adlestane* mentioned by *Bracton,* and was punished by loss of life.

> But in process of time that punishment seemed too hard; but the truth is, a severe punishment succeeded in the place thereof, *viz.* castration and the loss of eyes, as appears by Bracton (who wrote in the time of Henry III.). . . .

> This kind of punishment it seems continued till 3 E[dward] 1. and then by the statute of Westm[inster] 1. it was enacted, "That none ravish or take with force a damsel within age with her consent nor against her consent, nor no dame, damsel of age, nor any other woman against her will

. . . and the party convict shall suffer two years imprisonment, and be ransomed at the king's pleasure.

\* \* \*

But by the statute of Westm[inster] 2. the offense of rape is made felony, "If a man ravish a married woman, dame, or damsel, where she neither assented before nor after, *Eyt judgment de vy & member;* if she assent after, yet the king shall have the suit." [17]

1 Matthew Hale, *The History of the Pleas of the Crown* 626–27 (Sollom Emlyn ed., 1847) (citations omitted) (footnotes omitted).  By the time that rape was made a statutory offense late in 13th century England, then, the reference to virginity was removed as well as discussion of any status of the victim.

Hale himself defines rape as "the carnal knowledge of any woman above the age of ten years against her will, and of a woman-child under the age of ten years with or against her will," *id.* at 627, 629, and cites as illustrative *Lord Audley's Case,* 123 Eng. Rep. 1140 (1631).  Also known as the Earl of Castlehaven, Lord Audley was charged with rape for prostituting his wife to another man against her will.  Hale stated that not only was the assailant guilty of rape, but "the husband, being present, aiding and assisting, is also guilty as a principal in rape. . . . [I]n this case the wife may be a witness against her husband, and accordingly she was admitted, and [her husband] and [her assailant, Lord North] were both executed. 8 *Car.* 1. *Casus comitis Castlehaven.*"  1 Hale, *The History of the Pleas of the Crown* at 628–29.  That a husband could be found guilty of rape for allowing another man to take his wife against her will refutes the analysis that the English common law of rape was still tied to the Middle Eastern laws surrounding virginity and trespass against the property of men.

---

**17.**  Sir William Blackstone states that the crime of rape was changed back to a felony, punishable by death, under the statute of Westminster 2 because the "lenity" of the punishment of imprisonment and a fine was "productive of the most terrible consequences."  4 William Blackstone, *Commentaries on the Laws of England* 211–12 (1769).

Sir William Blackstone, writing in 1769, also notes in his *Commentaries on the Laws of England* the contrast between the civil law and the English common law on the subject of rape.[18] Discussing the civil law's prohibition against a prostitute "or common harlot" being the victim of rape, and referencing Bracton, Blackstone states that "the law of England does not judge so hardly of offenders, as to cut off all opportunity of retreat even from common strumpets, and to treat them as never capable of amendment. It therefore holds it to be felony to force even a concubine or harlot; because the woman may have forsaken that unlawful course of life." 4 William Blackstone, *Commentaries on the Laws of England* 213 (1769). Again, the reference to "recovering" prostitutes, capable of being the victims of rape, confirms that the English had progressed to a consideration of rape focusing on the harm done to the woman, any woman, rather than on a trespass on a man's interest in the virginity of his daughter or wife.

Hale and Blackstone wrote before the time of American independence, and Bracton's writings and Lord Audley's Case occurred before the founding of Maryland, so that Maryland's common law of rape reflected the offense as explored in their writings, rather than on the ancient conception. Our research leads us to conclude that the English common law of rape adopted by Maryland in the 17th century no longer reflected the ancient view that the harm done through rape was fully accomplished upon penetration, which itself continued to be considered a required element. *See* 1 Hale, *History of the Common Law of England* 628 ("To make a rape there must be an actual penetration. . . .").[19]

---

**18.** Blackstone describes rape as "the carnal knowledge of a woman forcibly and against her will." 4 William Blackstone, *Commentaries on the Laws of England* 210.(1769).

**19.** In determining the common law of rape, Baby also argues that a review of the element of penetration in our own jurisprudence supports his position. Baby correctly states that this Court has held that "[p]enetration is an essential element of the crime of rape at common law." *Edmondson v. State*, 230 Md. 66, 67, 185 A.2d 497 (1962); *Smith v.*

After the Revolution, in the American States there is a paucity of cases addressing the issue of withdrawal of consent. Withdrawal of consent arises infrequently in early American case law, and never directly presents the issue of post-penetration withdrawal of consent. In *Wright v. State*, 23 Tenn. (4 Hum.) at 195, for example, the Supreme Court of Tennessee held that is was not error for the trial court to instruct the jury to find the defendant guilty of rape "if the person abused, consented through fear, or that she was a common prostitute, or that she assented after the fact, or that she was taken at first with her own consent, if she was afterwards forced against her will." *See also Dawkins v. State*, 58 Ala. 376, 378 (1877) (noting that under common law, the "consent of the woman, yielded at any time before the act of penetration was complete, relieved the offense of its felonious character"); *State v. Shields*, 45 Conn. 256, 259 (1877) (holding there was no error in jury instruction that the jury "must be satisfied that there was no consent during any part of the act"); *Commonwealth v. McDonald*, 110 Mass. 405, 405–06 (1872) (same); *People v. Marrs*, 125 Mich. 376, 84 N.W. 284, 286 (1900) ("Consent, or failure to use the proper resistance, at

---

*State*, 224 Md. 509, 511, 168 A.2d 356, 357 (1961) (stating that "proof of penetration is an essential element of rape"); *Craig v. State*, 214 Md. 546, 547, 136 A.2d 243, 244 (1957) ("It is universally recognized . . . that penetration is an essential element of the crime of rape."). Baby also appropriately cites to Joseph Chitty's 19th century treatise on the criminal law to support the view that penetration is a key element in proving rape. *See* 3 Joseph Chitty, *A Practical Treatise on Criminal Law* 241 (1819) ("Rape is the carnal knowledge of a female, forcibly and against her will. The only difficulty which arises upon this definition, consists in the meaning which ought to be attributed to the words *carnal knowledge;* some judges [have] supposed that it is sufficient to [show] penetration alone, while others have contended that the offense is not complete without emission; but it seems to be agreed by all that the latter without the former will not suffice.") (citations omitted).

Baby's argument falters, however, when he states that the essential element of penetration "[makes] clear that withdrawal of consent after penetration does not render the intercourse rape." His argument logically does not follow from the importance placed on proof of penetration as an element of the crime of rape, nor have we, in our search of the history of the English common law, found any authority that supports this conclusion.

any time before the act of intercourse has actually occurred, precludes conviction for rape."); *Bailey v. Commonwealth*, 82 Va. 107, 111 (1886) (noting that if the victim "consent[s] before the act, it will not be rape"); *State v. Niles*, 47 Vt. 82, 84 (1874) (holding there was no error in trial court's instruction that "if the respondent commenced and entered upon sexual intercourse with her consent, but she then withdrew her consent, and the respondent forcibly continued the intercourse after he had knowledge of her dissent, it would be rape"); *State v. Hartigan*, 32 Vt. 607, 611 (1860) (holding that consent after the assault did not excuse the rape).

In only two of the early American cases is there any support for Baby's view, and the language in both is arguably dicta. In *State v. McCaffrey*, 63 Iowa 479, 19 N.W. 331 (Iowa 1884), the Supreme Court of Iowa considered whether there was sufficient evidence of lack of consent for the defendant to have been convicted of rape where he had vaginal intercourse with his 11 year old sister-in-law after she had allowed him to "take improper liberty with her person" in the past and "readily accepted his invitation to lie on the bed with him and allowed him to raise her dress and unbutton her drawers," but the victim testified "that afterwards she screamed and made resistance." *Id.* at 331. In concluding that there was sufficient evidence of lack of consent, the Court stated that "[w]hether she [screamed] before he had effected penetration is not entirely clear, but we think that there was evidence tending to show that she did" and we "think that the jury might have believed that the pain preceded penetration, and that if the screams and resistance followed immediately upon the pain, they preceded penetration also." *Id.* at 331–32. While this language suggests that the victim's withdrawal of consent must have preceded penetration in order to be sufficient, such a rule is not explicitly stated.

In *State v. Cunningham*, 100 Mo. 382, 12 S.W. 376 (1889), the Supreme Court of Missouri also considered whether there was sufficient evidence for a trier of fact to convict for the rape of a woman "of a weak mind," who may have been "dazed" at the time of the rape. *Id.* at 378. In concluding

that there was sufficient evidence to find that victim had not consented at the time of the rape, the Court noted that it "is doubtless true, as a proposition of law, that if consent is given after the assault, and before the act is completed by penetration, it will not be rape." *Id.* at 378–79. Like the language in *McCaffrey*, this statement suggests that consent had to be withdrawn before penetration in order for the defendant to be convicted of rape. Such a rule is not explicitly stated, however, and the Court's decision focused on the victim's state of mind, not the precise point at which consent was withdrawn.

In more recent years, the courts in many of our sister States have directly considered whether withdrawal of consent after penetration can constitute rape. Of these, only one court has held that it does not, the Supreme Court of North Carolina in *State v. Way*, 297 N.C. 293, 254 S.E.2d 760 (1979). In *Way*, the Court was asked to decide whether the trial court erred in answering the jury's question "whether consent can be withdrawn" by instructing that "consent initially given could be withdrawn and if the intercourse continued through use of force or threat of force and that the act at that point was no longer consensual this would constitute the crime of rape." *Id.* at 761. The Court determined that the instruction was erroneous, holding that if "the actual penetration is accomplished with the woman's consent, the accused is not guilty of rape," *id.* at 762, without any further analysis or citation of authority. Because of this lack of analysis, we do not find the *Way* decision to be persuasive.

In *State v. Robinson*, 496 A.2d at 1067, the Supreme Judicial Court of Maine was called upon to decide whether the trial judge had provided the jury with an incorrect jury instruction. During its deliberations, the jury sent the following question to the judge: "Concerning the law—if two people began consenting to an act, then one person says no and the other continues—is that rape?" *Id.* at 1069. The trial court responded by instructing the jury, "if a couple consensually engages in sexual intercourse and one or the other changes his or her mind, and communicates the revocation or change of

mind of the consent, and the other partner continues the sexual intercourse by compulsion of the party who changes his or her mind, then it would be rape. The critical element there is the *continuation under compulsion.*" *Id.* (emphasis in original). On appeal, the Court found no error in the trial court's instructions. Noting its disagreement with the North Carolina Court in the *Way* opinion, which it characterized as avoiding "any relevant analysis," *id.* at 1070, the *Robinson* Court stated that "the controlling provision of the Maine Criminal Code,[20] as well as common sense, establishes the correctness of [the trial court's] instruction." *Id.* at 1069. In accordance with the emphasis given "compulsion" in Maine's statutory definition of rape, which in its statute is conflated with lack of consent, the Court further stated that "[w]e emphasize that the ongoing intercourse, initiated we here assume with the prosecutrix's consent, did not become rape merely because she revoked her consent. It became rape if and when the prosecutrix thereafter submitted to the defendant's sexual assault only because [of force or the threat of force]." *Id.* at 1070.

In *State v. Bunyard*, 31 Kan.App.2d 853, 75 P.3d 750 (2003), the Kansas intermediate appellate court considered whether there was sufficient evidence of rape when the victim was a willing participant up until the time of initial penetration and did not withdraw consent until post-penetration. The Kansas statute was very similar to Maryland's current rape statute, as it defined rape as "(1) Sexual intercourse with a person who does not consent to the sexual intercourse, under any of the

---

**20.** Section 252(1)(B) of the Maine Criminal Code (1983) provided that: A person is guilty of rape if he engages in sexual intercourse: B. With any person, not his spouse, and the person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E. "Sexual intercourse" is defined in Section 251(1)(B) to mean "any penetration of the female sex organ by the male sex organ."
"Compulsion" is defined in Section 251(1)(E) to mean "physical force, a threat of physical force or a combination thereof which makes a person unable to physically repel the actor or which produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or upon another human being."

following circumstances: (A) When the victim is overcome by force or fear. . . ." Kansas Statutes Annotated Section 21–3502 (1996, 2002 Supp.). Responding to the appellant's contention that the moment of penetration is the crucial point at which to determine the presence or absence of consent, the court concluded that nowhere in its statutory definition of rape or sexual intercourse was it stated that intercourse ended with penetration, but rather that penetration "merely establishes a minimum amount of contact necessary to prove the offense." *Id.* at 756. The court continued:

> A participant in sexual intercourse may withdraw consent after penetration has occurred. The continuation of sexual intercourse after consent has been withdrawn, and in the presence of force or fear, is rape.

*Id.* The Court of Appeals of Kansas, therefore, found that there was sufficient evidence to find the defendant guilty of rape. The Supreme Court of Kansas reversed on other grounds, but agreed that the Kansas statute "proscribes *all* nonconsensual sexual intercourse that is accomplished by force or fear, not just the initial penetration." *State v. Bunyard*, 281 Kan. 392, 133 P.3d 14, 28 (2006) (emphasis in original).

In *State v. Siering*, 644 A.2d at 958, the intermediate appellate court of Connecticut also addressed whether the trial court's response to a jury question constituted error. The jury's question in that case was "if a person agrees to sexual intercourse then changes her mind, withdraws her consent, but is compelled to continue intercourse by use of force, does this constitute sexual assault?" *Id.* at 961. The trial court responded that "if there exists consensual intercourse and the alleged victim changes her mind and communicates the revocation or change of mind of consent and the other person continues the sexual intercourse by compelling the victim through the use of force then it would be sexual assault in the first degree." [21] *Id.* The court rejected the defendant's argu-

---

21. Connecticut's crime of sexual assault in the first degree stated in pertinent part:

ment that "if there is consent at the moment of penetration, the subsequent withdrawal of consent and continuation of intercourse accompanied by force cannot convert consensual intercourse into sexual assault." *Id.*

As with Maryland's definition of rape, Connecticut's definition of sexual assault in the first degree was originally derived from the English common law, and a statutory definition, based on the common law, was codified in the 1970s. In considering the propriety of the trial court's answer to the jury question, the court noted that the Connecticut statute did not suggest that " 'intercourse is complete' upon penetration; rather, it provides that 'penetration, however slight, [is sufficient] to complete ... intercourse,' " *id.* at 962 (alteration in original) (ellipses in original), quoting *State v. Mackor*, 11 Conn.App. 316, 527 A.2d 710, 713 (1987), and stated that it did

> not construe [its definition of intercourse] to mean that only the initial penetration constitutes intercourse. The defendant's argument would mean that the act that commences intercourse is also the act that simultaneously concludes intercourse.

It is axiomatic that statutes are not to be interpreted to arrive at bizarre or absurd results. The defendant's construction of the statute would mean that if intercourse is continued by force after the victim withdrew consent, it would not constitute sexual assault unless the victim, upon revoking consent and struggling against the defendant, succeeds in momentarily displacing the male organ, followed by an act of repenetration by the defendant.

The absurdity of this construction is demonstrated not only by the difficulty involved in the close evidentiary determina-

---

(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person.
Conn. Gen.Stat. § 53a–70 (a) (1993).

tion required but also because it protects from prosecution a defendant whose physical force is so great or so overwhelming that there is no possibility of the victim's causing even momentary displacement of the male organ.

*Id.* at 962–63, 527 A.2d 710 (citations omitted). We agree with the Connecticut appellate court that concluding that the act of penetration ends the act of sexual intercourse would lead to absurd results not contemplated by the drafters of our rape statute.

We find the analyses conducted by the Maine Court in *Robinson*, the Kansas court in *Bunyard*, and the Connecticut court in *Siering* to be persuasive.[22] We conclude, utilizing a similar framework, that our own rape statute punishes the act of penetration, which persists after the withdrawal of consent. Nor has our analysis of the English law of rape at the time of the Revolution yielded any commentary or case law that would support the interpretation that initial penetration completes the act of intercourse.

---

**22.** *See also McGill v. State,* 18 P.3d 77, 84 (Alaska Ct.App.2001) (holding that Alaska's statutes "do not limit 'sexual penetration' to the moment of initial penetration" and that "[n]othing in the legislative history of our statute supports [the] argument that once a person is sexually penetrated with consent, that consent cannot be withdrawn"); *In re John Z.,* 29 Cal.4th 756, 128 Cal.Rptr.2d 783, 60 P.3d 183, 185 (2003) (holding that "the offense of forcible rape occurs when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection"); *Maddox v. State,* 170 Ga.App. 633, 317 S.E.2d 658, 659 (1984) (finding no error when, in response to a jury question asking "if a person could initially consent to having sexual intercourse and then withdraw that consent," the trial court told the jury "that at the time of carnal knowledge as referred to in the statute, for there to be rape it must at that time be done forcibly and against the will of the victim"); *State v. Crims,* 540 N.W.2d 860, 865 (Minn.Ct.App.1995) (confirming the "holding that rape includes forcible continuance of initially-consensual sexual relations"); *State v. Jones,* 521 N.W.2d 662, 672 (S.D.1994) (holding there was no error in the trial court's refusal to instruct the jury that an "act of sexual intercourse does not constitute rape, where the female initially consents to the act, but after penetration, withdraws her consent, and the male, without interruption of penetration, continues the act against the will of the female and by means of force").

Based upon the foregoing analysis, we hold that a woman may withdraw consent for vaginal intercourse after penetration has occurred and that, after consent has been withdrawn, the continuation of vaginal intercourse by force or the threat of force may constitute rape. We iterate that force or the threat of force is, however, an essential element of the crime of rape as we first emphasized in *Hazel*, 221 Md. at 469, 157 A.2d at 925:

> Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend on the prevailing circumstances.... [F]orce may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.

See also *State v. Rusk*, 289 Md. 230, 244, 424 A.2d 720, 727 (1981) (holding that "the victim's fear be reasonably grounded in order to obviate the need for either proof of actual force on the part of the assailant or physical resistance on the part of the victim").

We, nevertheless, agree with the Court of Special Appeals that, in responding to the jury's questions, the trial court should have directly addressed the jurors' confusion on the effect of withdrawal of consent during intercourse, rather than simply referring the jurors to previously provided instructions on the elements of rape.

The State urges us to find that the trial judge did not abuse her discretion when she responded as she did to the jury's questions regarding post-penetration withdrawal of consent and argues that the trial court's reaffirmation of the previous-

ly provided instructions, substantively similar to the pattern instruction on the elements of rape, was sufficient to address the jury's questions, so long as we hold that withdrawal of consent post-penetration constitutes rape. The State cites *Battle* for the premise that a court's decision to reinstruct the jury is an abuse of discretion only if it that instruction is ambiguous, misleading, or confusing, 287 Md. at 685, 414 A.2d at 1271, as well as referring to the reasoning in *Robinson, Siering,* and other decisions of our sister States, in which no error was found in trial courts' jury instructions under similar circumstances. Also citing *Brogden v. State,* 384 Md. 631, 648, 866 A.2d 129, 139 (2005), the State alternatively argues that the trial judge had no duty to reply to one of the jury's questions because it referenced details such as ejaculation ("climax") that were not related to either the State or Baby's theories of the case, and so the questions had nothing to do with the case as it was presented. The State alternatively argues that, if we do determine that the trial court erred in response to the jury questions, the error was harmless beyond a reasonable doubt as it had no effect on jury's verdicts on any of the charges.

Baby argues that the trial court committed error by not providing the jury with the law it needed to decide the case, citing *Lovell v. State,* 347 Md. 623, 702 A.2d 261 (1997), for the proposition that the trial court has a duty to provide specific instruction on the law when a jury's questions indicate that it needs the information in order to reach a firm verdict. Baby argues that because the jury repeatedly asked for clarification on the effect of post-penetration withdrawal of consent, the trial court committed error by failing to directly address that issue and instead referring the jury to the pattern instructions. Citing *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), Baby argues that the failure of the trial court to specifically address the jury's questions was not harmless error as it cannot be asserted, beyond a reasonable doubt, that the jury's verdict on the first degree rape charge was not affected by the lack of clarification on the issue of post-penetration withdrawal of consent.

During deliberations, the jury submitted to the trial court a note which asked, "If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the man continues until climax, does the result constitute rape?" While Baby's attorney argued that the court should respond to the note in the negative, the court found the question as phrased to be confusing and ambiguous, as it was unclear what was specifically meant by "during the course of the sex act," and viewed the note as potentially presenting a question of fact, rather than law. The judge, therefore, replied, "I am unable to answer this question as posed. Please reread the instructions as to each element and apply the law to the facts as you find them." The following morning, the jury submitted another note which read, "If at any time the woman says stop is that rape?" Baby's counsel requested that the court provide the jury with "the exact answer that you gave to the note last night." The court, characterizing the second question as a more simple variation of the first, instructed the jury, "This is a question that you as a jury must decide. I have given the legal definition of rape which includes the definition of consent."

The definition which the trial judge had given was that, "Rape is unlawful vaginal intercourse with a female by force or threat of force and without her consent." The trial court also had supplied the jury with the descriptions of "vaginal intercourse," "force," and "consent" which were taken from the pattern jury instructions:

Vaginal intercourse means the penetration of the penis into the vagina. The slightest penetration is sufficient. An emission of semen is not required. The amount of force necessary depends upon the circumstances. No particular amount of force is required, but it must be sufficient to overcome the resistance of the victim. You must be satisfied that the victim either resisted and that this resistance was overcome by force or threat of force or that the victim was prevented from resisting by force or threat of force. She must have resisted to the extent of her ability at the

time unless her resistance or will to resist was overcome by force or fear that was reasonable under the circumstances.

Finally, consent means actually agreeing to the act of intercourse rather than merely submitting as a result of force or threat of force.

*See* Maryland Criminal Pattern Jury Instruction, Section 4:29.

In *Lovell,* 347 Md. at 623, 702 A.2d at 261, we held that a trial court must respond to a question from a deliberating jury in a way that clarifies the confusion evidenced by the query when the question involves an issue central to the case. We concluded that the trial court abused its discretion in a capital case when it refused to provide further guidance on the term "youthful age" when youthful age was a statutory mitigating circumstance. *Id.* at 660, 702 A.2d at 279. In reaching our holding, we cited *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354 (1946), in which Justice Frankfurter, writing for the Court, stated that when "a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy," as well as to *Price v. Glosson Motor Lines, Inc.,* 509 F.2d 1033, 1037 (4th Cir.1975), for the proposition that when "a jury makes a specific difficulty known . . . and when the difficulty involved is an issue . . . central to the case . . . helpful response is mandatory." *Lovell,* 347 Md. at 658–59, 702 A.2d at 278–79.

The question before us, then, is whether the jury's questions made explicit its difficulty with an issue central to the case such that the trial court was required to respond to the questions in a manner that directly addressed the difficulty. In both questions, the jurors inquired about the effect of a woman withdrawing consent during vaginal intercourse. The jury's questions relating to the timing of withdrawal of consent certainly touched upon an issue central to its ability to determine whether Baby had committed the crime of first degree rape. Referring the jury to the legal definition of rape that the court had previously provided was not sufficient to address either of the jury's questions as the definition makes no

reference to the issue of post-penetration withdrawal of consent which was central to the jury's questions.

The State's reference to *Brogden*, 384 Md. at 631, 866 A.2d at 129, is misplaced because the jury's questions directly touched upon the State's argument that the necessary element of absence of consent could be ascertained from the evidence. In *Brogden*, we were asked to decide whether it was error for the trial court to reply to jury questions by explaining a defense to the charge of wearing, carrying or transporting a handgun, where that defense was never proffered by the defendant. The jury questions at issue in *Brogden* were: "Is having a gun a crime?" and "Does the State have the burden to prove that he did not have a license ... ?" *Id.* at 635, 866 A.2d at 131. In responding to the second question, the court instructed the jury that "you may wear, or carry, or transport a handgun, if you have a license, in accordance with the terms of the license." *Id.* at 639, 866 A.2d at 133. We concluded that, while a trial court has discretion in giving supplemental instructions to the jury, "it is only within the ambit of the trial judge's discretion in the first instance if the supplemental instruction actually relates to an issue presented at trial," and that the trial court therefore erred in giving the instruction as it was never argued that the defendant did or did not have a gun license. *Id.* at 640–41, 866 A.2d at 134–35.

The State argues that jury's reference to "climax" in its first jury instruction makes its question analogous to the question in *Brogden*, such that the trial court was not required to specifically address the content of the question as the issue of ejaculation was not argued at trial. The jury's reference to "climax," however, while inapposite, did not negate the relevancy of their query, because the parties and the trial judge surmised that the question was not about climax or ejaculation, but about post-penetration withdrawal of consent. Additionally, the jury's second question made no reference to ejaculation or any other extraneous details, simply asking, "If at any time the woman says stop is that rape?"

We cannot determine that the trial court's error in not reinstructing on post-penetration withdrawal of consent is harmless beyond a reasonable doubt, as required by *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). In *Dorsey*, this Court concluded that

> when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded— may have contributed to the rendition of the guilty verdict.

*Id.* We cannot say that it is beyond any reasonable doubt that a response that more directly addressed this issue would have yielded a guilty verdict on the first degree rape count.

## II. The First Degree and Third Degree Sexual Offenses

The State also argues that, regardless of whether we remand for a new trial on the counts of rape, we should not reverse Baby's convictions for first and third degree sexual offense as they were unrelated to the subject matter of the jury's questions. Baby, conversely, contends that the failure of the trial court to specifically address the jury's questions was not harmless error as it cannot be asserted, beyond a reasonable doubt, that the jury's verdicts on the first and third degree sexual offense charges were not affected by the lack of clarification on the issue of post-penetration withdrawal of consent.

Like the Court of Special Appeals, we do not find the State's argument persuasive that the jury's questions only represented doubt as to the effect of withdrawal of consent in relation to intercourse. It is true that the jury's instructions specifically mentioned consent "to sex" and "rape," and did not specifically mention the actions for which Baby was convicted on the sexual offense charges, specifically aiding and abetting Mike in an act of anal penetration and touching J.L.'s breast

and vagina without her consent. Lack of consent is an element common to both rape and first and third degree sexual offenses, however.[23] Any clarification which the jury received on the element of consent would have been applicable to its understanding of the first and third degree sexual offense counts, as well as the rape charges. A further instruction on the effect of post-penetration withdrawal of consent may have conceivably affected the jury's verdict on the charge of rape, so it may have altered the verdicts on the sexual offense charges. Applying the *Dorsey* standard, we cannot conclude beyond a reasonable doubt that the trial court's error in not clarifying the effect of post-penetration withdrawal of consent was harmless.

### The Testimony of Dr. Ann Burgess as an Expert on "Rape Trauma Syndrome"[24]

■ Although we need not address the issue of whether Baby preserved his objection to the admission of the testimony of Dr. Ann Burgess as an expert on "rape trauma syndrome," for the guidance of the circuit court on remand, should Dr. Burgess be recalled during a new trial, we shall address Baby's contention that Dr. Burgess' expert testimony on "rape trauma syndrome" should have been subjected to a *Frye–Reed* hearing prior to its admission, assuming the interposition of an appropriate objection. Baby argues a number of reasons why Dr. Burgess' testimony on "rape trauma syndrome" should not have been admitted into evidence, in-

---

**23.** Under Section 3–303 of the Criminal Law Article, Maryland Code (2002), first degree rape is defined, in part, as "vaginal intercourse with another by force, or the threat of force, without the consent of the other." Under Section 3–305 of the Criminal Law Article, Maryland Code (2002), first degree sexual offense is defined, in part, as "sexual act with another by force, or the threat of force, without the consent of the other." Under Section 3–307 of the Criminal Law Article, Maryland Code (2002), third degree sexual offense is defined, in part, as "sexual contact with another without the consent of the other."

**24.** According to Dr. Burgess' testimony, "rape trauma syndrome" is a term which she and a colleague coined to describe certain patterns of behaviors which women exhibit in response to having been raped.

cluding that the term "rape trauma syndrome" was prejudicial and that she improperly rendered an opinion that J.L. had been raped; we only address, however, Baby's argument that the testimony was inadmissible because the reliability of "rape trauma syndrome" was not subjected to scrutiny under the *Frye–Reed* standard. Baby argues that because "[n]o appellate court in Maryland has approved the introduction of 'rape trauma syndrome' evidence in a criminal trial for any purpose," such evidence must first be submitted to a *Frye–Reed* inquiry to determine general acceptance in the scientific community before a trial court can consider allowing expert testimony based upon this scientific theory.

Dr. Burgess was asked to testify about post-traumatic stress disorder ("PTSD") and "rape trauma syndrome." As Dr. Burgess testified, "rape trauma syndrome" is a term that she and a colleague developed in 1974 to describe the "response patterns" they observed in women who had been raped. Dr. Burgess described how many of the general public's perceptions concerning rape are incongruous with the behaviors she and her colleagues have observed in the victims of sexual assault. In response to questions from the State, Dr. Burgess also stated whether she thought that certain actions such as offering "minimal, physical resistance" against her attacker, not immediately reporting the rape to the first person she saw "even if that person might be their best friend," and engaging in everyday activities within a short time after the rape such as "going to a supermarket and shopping," would be consistent with the behavior of a victim of rape, such behaviors as those explicated in J.L.'s testimony. The State offered Dr. Burgess as an expert witness in order to explain how the perceived aberrant behavior of victims of sexual assault can be explained as a result of "rape trauma syndrome."

In *Reed*, 283 Md. at 374, 391 A.2d at 364, this Court was asked to rule on the admissibility of voice identification testimony based on the analysis of spectrograms, otherwise known as "voiceprints." In concluding that "voiceprint" analysis was inadmissible in Maryland courts as evidence of voice identifica-

tion, we adopted the test for establishing the reliability of scientific methodology articulated in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). We characterized the *Frye* standard as requiring that "before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, ... then expert testimony based upon its validity cannot be admitted into evidence." *Reed*, 283 Md. at 381, 391 A.2d at 368.

*Reed* set forth *Frye* as a "legal standard which governs the trial judge's determination of a threshold issue," stating that "if a technique does not meet the *Frye* standard, a trial judge will have no occasion to reach [the] further issues" of whether the expert testimony "will be helpful to the jury [and whether] ... the expert is properly qualified." *Id.* at 389, 391 A.2d at 372. *See also Clemons v. State*, 392 Md. 339, 344, 363, 896 A.2d 1059, 1061, 1073 (2006) (characterizing our decision in *Reed* as "mak[ing] evidence emanating from a novel scientific process inadmissible absent a finding that the process is generally accepted by the relevant scientific community" and requiring that "prior to the admission of expert testimony based on the application of novel scientific techniques, the party seeking to use the expert testimony must establish that the particular methodology is valid and reliable").[25]

---

**25.** Maryland Rule 5–702 governs the testimony of experts and states:
Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.
The Committee Note to Rule 5–702 states in relevant part:
This Rule is not intended to overrule *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978) and other cases adopting the principles enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The required scientific foundation for the admission of novel scientific foundation

The State argues that in *Hutton,* 339 Md. at 504, 663 A.2d at 1301, we took judicial notice of the reliability and validity of "rape trauma syndrome," when we stated that "[e]xpert testimony describing PTSD or rape trauma syndrome may be admissible, however, when ... offered, for example, to show lack of consent or to explain behavior that might be viewed as inconsistent with the happening of the event." This statement, however, could not, in any way, be construed as a holding that "rape trauma syndrome" testimony is admissible under *Frye–Reed,* as that was not the issue before us. Rather, our analysis in *Hutton* supports the proposition that "rape trauma syndrome" represents a scientific theory or methodology whose reliability must be established under *Frye–Reed* before opinions based upon it can be admitted into evidence, *see id.* at 493–97, 663 A.2d at 1295–96, as also reflected in the decisions of courts in our sister States that have addressed "rape trauma syndrome" and its umbrella syndrome, PTSD.[26]

---

for the admission of novel scientific techniques or principles is left to development through case law.

**26.** Courts in our sister States, in which the *Frye* standard is applicable, which have addressed the admissibility of expert testimony about "rape trauma syndrome" have generally considered as a threshold issue whether the evidence is accepted as reliable and valid in the scientific community as is required by the *Frye* standard. *See People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291, 298 & n. 7, 299 (1984) (holding that the trial court erred in admitting "rape trauma syndrome" testimony to prove that a victim had been raped, iterating that the *Frye* standard is the proper basis for determining the admissibility of "rape trauma syndrome" testimony); *State v. Marks,* 231 Kan. 645, 647 P.2d 1292, 1299 (1982) (holding that expert psychiatric testimony on "rape trauma syndrome" is relevant and admissible where the defense is consent, iterating that the *Frye* standard is applicable to testimony regarding a psychiatric diagnosis such as "rape trauma syndrome"); *State v. Saldana,* 324 N.W.2d 227, 229, 230 (Minn.1982) (holding that it was error for the trial court to admit expert testimony on "rape trauma syndrome" to prove that a victim had been raped, stating that "[r]ape trauma syndrome is not the type of scientific test that accurately and reliably determines whether a rape has occurred" and that the "scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations"); *State v. Taylor,* 663 S.W.2d 235, 239, 240 (Mo.1984) (holding that an expert's conclusion that the victim suffered from "rape trauma syndrome" as a result of rape was improper,

We have reaffirmed the importance of *Frye–Reed* analysis in determining the validity and reliability of a wide variety of scientific methodologies and conclusions, including various syndromes. In *State v. Smullen,* 380 Md. 233, 266, 844 A.2d 429, 448 (2004), we held that while expert testimony on "battered spouse syndrome," and by analogy, "battered child syndrome," is admissible by statute, such social scientific evidence would otherwise be subjected to analysis under *Frye–Reed. See also Montgomery Mutual Insurance Company v. Chesson,* 399 Md. 314, 333, 923 A.2d 939, 950 (2007) (holding that the trial court erred in failing to conduct a *Frye–Reed* hearing before admitting expert testimony on "sick building syndrome" in a workers' compensation matter); *Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 430 n. 18, 914 A.2d 113, 128 n. 18 (2007) (noting that expert testimony on the link between vaccines and autism would have to pass the *Frye–Reed* test before it could be admitted into evidence); *U.S. Gypsum Co. v. Mayor and City Council of Baltimore,* 336 Md. 145, 182, 647 A.2d 405, 423 (1994) (holding that the trial court did not err in admitting testimony based upon a surface dust sampling technique that passed the *Frye–Reed* standard for general acceptance in the relevant scientific community). *Cf. State v. Allewalt,* 308 Md. 89, 99, 517 A.2d 741, 746 (1986) (holding that the trial court did not abuse its

iterating that "admission of scientific evidence depends on wide acceptance in the relevant scientific community of its reliability"); *People v. Taylor,* 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 134 (1990) (holding that trial court did not commit error by admitting testimony on "rape trauma syndrome" because "the relevant scientific community has generally accepted that rape is a highly traumatic event that will in many women trigger the onset of certain identifiable symptoms," allowing it to be admitted under the *Frye* standard); *State v. Black,* 109 Wash.2d 336, 745 P.2d 12, 18 (1987) (holding that the trial court erred in allowing testimony on "rape trauma syndrome" to prove that the victim had been raped, finding that "rape trauma syndrome" does not meet the standard of reliability articulated in *Frye* ). *But see Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355, 358–59 (1988) (holding that testimony on "rape trauma syndrome" was not admissible to bolster victim's credibility, although the court did not address whether the testimony should have been subjected to a *Frye* analysis as a threshold matter).

discretion in admitting testimony on PTSD, we stated that "[t]here is no issue in this case over the fact that psychiatrists and psychologists recognize PTSD as an anxiety disorder," and, in essence, took judicial notice of its admissibility under *Frye–Reed* ).

In *Bloodsworth v. State,* 307 Md. 164, 512 A.2d 1056 (1986), we were asked to determine whether the trial court had erred in not admitting expert testimony on the issue of eye-witness identification, a decision partially based on the evidence not meeting the *Frye–Reed* standard of acceptance in the relevant scientific community. We held that while the *Frye–Reed* test was not applicable to the eyewitness identification evidence, the trial court did not abuse its discretion in declining to admit the expert testimony as its decision was also based on an alternate ground. In our analysis of the applicability of the *Frye–Reed* standard in *Bloodsworth,* we noted with approval the similarity between the catalog of types of evidence which we stated would be subjected to *Frye* analysis in *Reed* and a list of scientific devices or processes to which California courts had applied *Frye* analysis, as provided by the California court in *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984), which list included "rape trauma syndrome." *Bloodsworth,* 307 Md. at 184, 512 A.2d at 1066.

While it is true that not all testimony based upon scientific theory or methodology must first be subjected to a hearing on its reliability and validity, as we stated in *Wilson v. State,* 370 Md. 191, 201, 803 A.2d 1034, 1039 (2002),

Where the validity and reliability of a scientific technique is so broadly and generally accepted within the scientific community, as in the case of ballistic tests, blood tests, and the like, a trial court may take judicial notice of its reliability.

We suggest that "rape trauma syndrome" evidence should first be subjected to *Frye–Reed* analysis, were an appropriate objection interposed.

### Conclusion

We conclude that post-penetration withdrawal of consent negates initial consent for the purposes of sexual offense

crimes and, when coupled with the other elements, may constitute the crime of rape. We also hold, however, that the trial court erred in failing to sufficiently address the jury's questions on post-penetration withdrawal of consent, and such error was not harmless beyond a reasonable doubt.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND JUDGMENTS OF CONVICTION IN THE CIRCUIT COURT OF MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.***

BELL, C.J., RAKER, HARRELL and WILNER, JJ., concur and dissent.

RAKER, J., concurring and dissenting, in which WILNER, J., joins; BELL, C.J., joins in Part I only; HARRELL, J. joins in Part II only.

I agree with the majority that petitioner's rape conviction should be reversed, but for different reasons. I agree that the trial court erred in not answering the jury's note with respect to the effect of a woman's withdrawal of initial consent post-penetration on the elements of rape. In my view, however, *Battle v. State*, 287 Md. 675, 414 A.2d 1266 (1980), controlled the trial court's response, and the court should have told the jury that if a woman consents prior to penetration and withdraws the consent following penetration, there is no rape. Nonetheless, I would expressly overrule that aspect of *Battle* and hold, prospectively only, "that post-penetration withdrawal of consent negates initial consent for the purposes of sexual offense crimes and, when coupled with the other elements, may constitute the crime of rape." *See State v. Baby*, 404 Md. 220, 271–72, 946 A.2d 463, 493 (2008).

I disagree with the judgment of the majority reversing petitioner's convictions for sexual offenses in the first and third degree. I would hold that the error in the failure to clarify the elements of rape has no bearing whatsoever on the sexual offenses committed by Mike and in which petitioner

had been convicted as a principal in the second degree. Therefore, I would affirm those two convictions.

The majority holds that a woman may withdraw consent for vaginal intercourse after penetration has occurred and that, after consent has been withdrawn, the continuation of vaginal intercourse by force or the threat of force may constitute rape. *Baby*, 404 Md. at 260, 946 A.2d at 486. I agree with that conclusion. Because the trial court did not directly address the jurors' confusion on the effect of withdrawal of consent during the elements of rape, the Court reverses petitioner's convictions. The Court reverses not only for rape, but for the other convictions for first degree and third degree sexual conduct. *Baby*, 404 Md. at 260, 946 A.2d at 487.

The majority reasons that "the jury's questions relating to the timing of withdrawal of consent certainly touched upon an issue central to its ability to determine whether Baby had committed the crime of first degree rape." *Baby*, 404 Md. at 263, 946 A.2d at 488–89. The jury was obviously struggling with the legal definition of rape and particularly the issue of post-penetration withdrawal of consent, and I agree that the trial court should have supplemented its instructions to aid the jury.

I part company with the majority view as to whether the language in *Battle* was a holding or *dicta*. If it was *dicta*, as the majority states, then on remand, petitioner may be retried and the jury should be instructed that a woman's withdrawal of consent, post-penetration, could be rape. If the language in *Battle* was a holding of this Court, then if petitioner is retried, the jury should be instructed to the contrary and consistent with the *Battle* language, because that was the law when the acts in question occurred.

As to any effect of the court's error as to the rape instruction on the other sexual offense convictions, the majority holds that those offenses could have been infected by the trial court's failure to clarify the instruction and reverses, stating as follows:

"It is true that the jury's instructions specifically mentioned consent 'to sex' and 'rape,' and did not specifically mention the actions for which Baby was convicted on the sexual offense charges, specifically aiding and abetting Mike in an act of anal penetration and touching J.L.'s breast and vagina without her consent. Lack of consent is an element common to both rape and first and third degree sexual offenses, however. Any clarification which the jury received on the element of consent would have been applicable to its understanding of the first and third degree sexual offense counts, as well as the rape charges. A further instruction on the effect of post-penetration withdrawal of consent may have conceivably affected the jury's verdict on the charge of rape, so it may have altered the verdicts on the sexual offense charges. Applying the *Dorsey* standard, we cannot conclude beyond a reasonable doubt that the trial court's error in not clarifying the effect of post-penetration withdrawal of consent was harmless.

*Baby,* 404 Md. at 265–66, 946 A.2d at 490. While I agree with the majority that post-penetration withdrawal of consent could be rape, I disagree with the majority's conclusion that the instruction on rape had an effect on the sexual offense convictions.

## I. The Rape Conviction and the Jury Instruction

The rape conviction should be reversed and remanded to the Circuit Court. As the Court of Special Appeals stated, "[t]he jury, in the discharge of its responsibilities to apply the law to the facts as it found them to be, was entitled to a proper response to its inquiries." *Baby v. State,* 172 Md.App. 588, 607, 916 A.2d 410, 421 (2007). Whether the *Battle* language was *dicta* or holding then becomes highly significant at any retrial of petitioner. In my view, the statement at issue from *Battle* was a holding.

### Battle: *Dicta* or Holding

The majority holds that the statement, "On the other hand, ordinarily if she consents prior to penetration and withdraws

the consent following penetration, there is no rape," found in *Battle v. State*, 287 Md. 675, 684, 414 A.2d 1266, 1270 (1980), is *dicta*. Whether the statement is *dicta* or a holding is not merely an academic exercise, but instead, has real significance in the event there is a retrial of this case, for several reasons. If this Court is not now stating new law or changing the law of rape in Maryland, (and the *Battle* language was *dicta* ), at any retrial, the court should instruct the jury that post-penetration withdrawal of consent may constitute rape. If the Court is announcing a new rule of law, (and the *Battle* language was a holding and not *dicta* ), the jury should be instructed that if a woman actually consents to sexual intercourse prior to penetration and withdraws the consent following penetration, there is no rape. This new rule of law may be applied prospectively only. *Walker v. State*, 343 Md. 629, 637–40, 684 A.2d 429, 432–33 (1996).

The *dicta* /holding argument was presented to the Court of Special Appeals. It seems to me that the Court of Special Appeals found the *Battle* language to be binding on the Circuit Court, and hence, a holding. The intermediate appellate court stated as follows:

"Although *Siering*[1], as does the State, denominated the language at issue in *Battle* as 'arguably' *dicta, Bunyard*[2] refers to it as 'the holding of *Battle.*' As noted, whether the *Battle* pronouncement is dicta is immaterial to the trial court's obligation to inform the jury of the current status of Maryland law. It is currently a statement of Maryland law, that has neither been overruled nor commented upon negatively. Whether it should be revisited in light of the weight of authority to the contrary is a matter for the Maryland legislature or the Court of Appeals. Under *Battle*, no rape occurred if the jury found that the prosecutrix withdrew her prior consent after penetration. The trial judge was obliged to answer the jury's questions and it should have been

---

1. *State v. Siering,* 35 Conn.App. 173, 644 A.2d 958 (1994).

2. *State v. Bunyard,* 31 Kan.App.2d 853, 75 P.3d 750 (2003).

advised that, under Maryland law, the answer is 'no' to the question, 'If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the ... man continues until climax, does the result constitute rape?' The holding in *Battle*, of course, would not have been a bar to a conviction for common law assault for any continuation of the sexual act against the complainant's will after the withdrawal of consent."

*Baby v. State,* 172 Md.App. at 620–621, 916 A.2d at 429 (footnote omitted).

Admittedly, it is not always easy to distinguish between *dicta* and a holding. The distinction between a holding and *dicta,* while difficult to define, is also difficult to apply. *See, e.g.,* RICHARD A. POSNER, THE FEDERAL COURTS: CRISIS AND REFORM 252–53 (1985) ("[R]emarkably—considering how fundamental the distinction is to a system of decision by precedent—the distinction [between holding and dictum] is fuzzy not only at the level of application but also at the conceptual level."); Patricia M. Wald, *The Rhetoric of Results and the Results of Rhetoric: Judicial Writings,* 62 U. CHI. L.REV. 1371, 1411 (1995) ("But line drawing between holding and *dicta* can be blurry; as we have seen, the same language of a prior opinion is often classified differently by future judges dependent on whether they like what it says or not."). The distinction between dicta and holdings has been described as "famously elusive." Peter J. Smith, *The Marshall Court and the Originalist's Dilemma,* 90 MINN. L.REV. 612, 637 (2006). *See also* Michael C. Dorf, *Dicta and Article III,* 142 U. PA. L.REV. 1997, 2003 (1994) ("[N]o universal agreement exists as to how to measure the scope of judicial holdings. Consequently, neither is there agreement as to how to distinguish between holdings and *dicta.*"); Comment, *Dictum Revisited,* 4 STAN. L.REV. 509, 512 (1952) (suggesting that the word "*dictum*" may mean nothing more than "I do not have to follow this case").

Most lawyers recall learning in law school that the term "holding" refers "to a rule or principle that decides the case,"

the *ratio decidendi* of the case, whereas *dicta* "typically refers to statements in a judicial opinion that are not necessary to support the decision reached by the court." Dorf, *Dicta and Article III*, 142 U. PA. L. REV. at 2000. *See also Krupnick v. Hartford Accident & Indem. Co.*, 28 Cal.App.4th 185, 34 Cal.Rptr.2d 39, 47 (1994) (equating *ratio decidendi* to holding of a case). This test is often known as the logical necessity test, and is drawn from Black's Law Dictionary definition. *See, e.g., Vogel v. State*, 315 Md. 458, 466, 554 A.2d 1231, 1234 (1989); *Schmidt v. Prince George's Hospital*, 366 Md. 535, 551, 784 A.2d 1112, 1121 (2001). On the other hand, some scholars and judges have proposed other definitions of *dicta*. An alternate definition has been proposed by Professors Michael Abramowicz and Maxwell Sterns, as follows:

"A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta."

Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 STAN. L.REV. 953, 961 (2005). Discussing the concept of *dicta* versus a holding, Judge Alex Kozinski stated as follows:

"Of course, not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to revisit the issue in a later case. However, any such reconsideration should be done cautiously and rarely—only where the later panel is convinced that the earlier panel did not make a deliberate decision to adopt the rule of law it announced. Where, on the other hand, it is clear that a majority of the panel has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue, that ruling becomes the law of the circuit and can only be overturned by an en banc court or by the Supreme Court."

*United States v. Johnson,* 256 F.3d 895, 915–16 (9th Cir.2001) (footnote omitted).   Another view of the dicta/holding distinction is as follows:

> "Courts and commentators sometimes assert that a statement is *dictum* if it was not essential to the outcome of the case.   This formulation focuses on the facts and the outcome in the precedent case, and asks which facts were material to the decision.   According to this view, elaborations of legal principle that are broader than the narrowest proposition that could have decided the case given its particular facts are considered *dicta.*   Although frequently deployed in practice, this formulation of the distinction between holdings and *dicta* has serious potential for judicial manipulation to serve instrumentalist ends, and often results in a patchwork of precedent that provides little guidance to lower courts and potential litigants.   The competing explanation of the distinction between holdings and *dicta* focuses on the rationale of the precedent case.   Under this definition, courts are bound by statements that form part of the rationale of the decision in the precedent case, even if, when viewed from a *post hoc* perspective, they were not technically essential to the result.   Although this formulation of the distinction between holdings and dicta raises definitional problems of its own—specifically, there is no neat way to determine the 'rationale' of the precedent decision—it is more consistent with the rule of law and a greater obstacle to judicial instrumentalism.

Peter J. Smith, *The Marshall Court and the Originalist's Dilemma,* 90 MINN. L.REV. 612, 638–39 (2006) (footnotes omitted).   Finally, commentators and courts have distinguished between obiter *dicta* and judicial *dicta* (sometimes referred to as considered *dicta* ), noting as follows:

> "The line between *dicta* and holding is further clouded by the presence of a middle ground, labeled 'judicial *dicta.*' Judicial *dictum* is generally defined as 'an opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is not essential to the decision.'   Statements of judicial

*dicta* are technically '*dicta*' because they are not necessary to the holding of a case. They do not, however, implicate to the same degree as ordinary dicta the concern of 'full consideration,' which is one of the rationales for treating dicta and holdings differently. Unlike ordinary *dicta*, judicial *dicta* is, by definition, well-reasoned and stated only after the court has investigated an issue with care. Accordingly, courts afford judicial *dicta* greater deference than ordinary *dicta*, treating judicial *dicta* almost like holdings."
David Coale & Wendy Couture, *Loud Rules*, 34 PEPP. L.REV. 715, 727–28 (2007).

The idea that the distinction between holding and *dicta* is not easily discerned is not a new concept. Indeed, in *Carstairs v. Cochran*, 95 Md. 488, 52 A. 601 (1902), our predecessors opined on the subject, stating as follows:

"We cannot agree that the expression of opinion referred to was an *obiter dictum*. All the constitutional objections which are here urged, were urged in that case by the late Judge Fisher with all the ability and force for which he was so justly distinguished, and the ruling upon the prayers, which there constituted the single exception, required the consideration by the Court of all those objections. *It may be difficult to frame a concise definition of an obiter dictum applicable to every such expression of opinion*, and some Courts incline to the rule that the most deliberate expression of opinion, upon a question distinctly raised in the record, and fully argued by counsel, may nevertheless be regarded as a *dictum*, unless essential to the actual disposition made of the case. But as Bouvier well says: 'It is difficult to see why, in a philosophic point of view, the opinion of the Court is not as persuasive on all the points which were so involved in the cause that it was the duty of counsel to argue them, and which were deliberately passed on by the Court, as if the decision had hung upon but one point;' and in Maryland the rule is in accord with this view. In *Alexander v. Worthington*, 5 Md. 489, it is said: 'All that is necessary in Maryland to render the decision of the Court of Appeals authoritative on any point decided, is to show

that there was an application of the judicial mind to the precise question adjudged;' and in *Michael v. Morey,* 26 Md. 261, it was said that a decision there cited, could not be said to be *obiter dictum,* 'as the question was directly involved in the issues of law raised by the demurrer to the bill, and the mind of the Court was directly drawn to, and distinctly expressed upon the subject.' "

*Id.* at 499, 52 A. at 602.

I do not believe that the language at issue in *Battle* was obiter *dicta* or judicial *dicta* but instead believe that it was part of the *ratio decidendi* of the case and therefore a holding. The *Battle* statement was hardly the expression of a court on a collateral question or a mere illustration originating with the author of the opinion. The question was directly involved in the issues raised in the case. The statement was hardly a "by the way" statement, incidental to the question in the case. The *Battle* jury sought to determine when, in point of time, a withdrawal of consent would sustain a conviction for rape.

Significantly, a review of the briefs filed in the *Battle* case indicate that this issue was raised and argued in the brief of the appellant. The record reflects that appellant's counsel objected to the court's jury instruction, arguing "that the instruction was wrong because it incorrectly told the jury that consent could be withdrawn during the sex act thus converting consensual intercourse to rape." Brief for Appellant at 6, *Battle v. State,* 287 Md. 675, 414 A.2d 1266 (1980) (No. 159). Appellant then argued as follows:

"The jury may have been unsure about whether consent could be withdrawn while sexual intercourse (penetration) was taking place. The answer to that would have been 'no.' *Hazel v. State,* 221 Md. 464, 469, 157 A.2d 922 (1960)."

*Id.* at 12.

The trial court should have instructed the jury in the language of *Battle.*

## II. The First Degree and Third Degree Sexual Offenses

Baby's convictions for first degree and third degree sexual offense, based on his conduct as a principal in the second degree to the criminal, sexual conduct of his friend, Mike, should be affirmed. These charges and convictions were unrelated in any manner to the question posed by the jury. The sexual offense charges arise from separate and discrete acts, that of aiding and abetting Mike in an act of anal penetration and the touching of J.L.'s breasts and vagina without her consent, which are entirely unrelated to the issue of post-penetration withdrawal of consent during the separate act of sexual intercourse.

Even though lack of consent is an element to the rape and sexual offenses, there was absolutely no evidence that the victim consented to Mike's acts of first degree and third degree sexual offense, offenses in which the jury found petitioner to be a principal in the second degree. The majority's statement that "[a] further instruction on the effect of post-penetration withdrawal of consent may have conceivably affected the jury's verdict on the charge of rape, *so it may it have altered the verdicts on the sexual offense charges* " is a bald conclusion, with no reasoning or facts to support it. *Baby*, 404 Md. at 266, 946 A.2d at 490. A plain reading of the jury question makes it crystal clear that the question related only to the rape charges against Baby. As the Court of Special Appeals said:

"The plain meaning of the jury's words, 'during the sex act,' leads one ineluctably to conclude that the reference was to the act of intercourse.... [I]f there had been initially any cause for confusion, it certainly should have been cleared up when the jury submitted the second note the following morning: 'If at any time, the woman says stop, is that rape?'.... A fair interpretation of the jury's question is that it was an inquiry as to the legal effect of a withdrawal of consent *subsequent to* penetration, and prior to climax."

*Baby*, 172 Md.App. at 605–06, 916 A.2d at 420. Moreover, the absence of *any* evidence of the victim consenting to Mike's

acts makes the Court's *ipse dixit* conclusion is too great a leap. The first degree and third degree sexual offense convictions should be affirmed.

Judge WILNER authorizes me to state that he agrees with and joins this concurring and dissenting opinion. Chief Judge BELL authorizes me to state that he agrees with and joins Part I only. Judge HARRELL authorizes me to state that he agrees with and joins Part II only.