981 A.2d 698

**Nathaniel W. ADDISON, Jr.**

**v.**

**STATE of Maryland.**

**No. 97, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Oct. 2, 2009.

---

166

Ian A. Erikson (Skadden, Arps, Slate, Meagher & Flom (Nancy Forster, Public Defender), on brief), Washington, DC, for Appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: HOLLANDER, WRIGHT, GRAEFF, JJ.

WRIGHT, J.

In January 2008, appellant, Nathaniel W. Addison Jr., was tried by jury in the Circuit Court for Montgomery County and convicted of first-degree assault and wearing and carrying a dangerous weapon. The jury hung as to the charge of attempted murder, with the State later entering a nolle prosequi on that count, subsequent to sentencing. Addison poses three issues, which we have combined and condensed, as follows: [1]

---

1. We have rephrased the three issues originally posed by Addison, as the first two questions are really one question, and the third is an

Did the trial court err in allowing expert testimony on domestic violence? For the reasons set forth below, we affirm the judgments of the trial court.

## Facts

On July 11, 2007, two eyewitnesses saw the victim in this case, Wendy Ward, being stabbed and beaten by a man. At trial, the two witnesses both testified to seeing a man repeatedly stabbing a woman with something in his hand. One of the witnesses, David Fuentes, cautiously approached the altercation, fearing for his own safety, shouting at the man in hopes of stopping him. According to testimony, Fuentes's appearance was enough to halt the violence and cause the assailant to run away. Fuentes and the other witness, Christian Aguierre, both testified to seeing no one else at the scene other than the man and the woman. Fuentes and Christian Aguierre could not identify the assailant.

Ward was taken to Suburban Trauma Center with numerous puncture wounds, some superficial, and one puncturing the skull, causing bleeding of the brain. After an operation to reduce the bleeding and swelling in her brain, Ward eventually recovered from her 30 puncture wounds.

---

argument of a factor regarding reversible error. Addison's original issues were as follows:

1. Whether the trial court erred in permitting expert testimony that was not reliable and not based [on] generally accepted scientific principles, in contravention of standards established under *Frye/Reed*, because (i) the testimony purported to describe psychological symptoms and draw conclusions about battered women and recantation outside the context of the narrowly defined Battered Woman's Syndrome and (ii) the witness was not qualified to give such testimony[.]

2. Whether the trial court erred under Maryland Rule 5–702 in permitting expert testimony concerning psychological symptoms and characteristics of battered women who have been subjected to a cycle of violence, and their dysfunctional relationships, when (i) the State adduced evidence of only a single, charged assault, (ii) the State adduced no evidence of any prior acts of domestic abuse involving the victim and Mr. Addison[.]

3. Whether the improper admission of expert testimony concerning domestic violence and battered women was prejudicial and not harmless error, where the credibility and sincerity of her recantation was critical to the outcome of trial[.]

Shortly after the attack and while she was in the emergency room, Ward spoke to a number of people who later testified at trial. Among those that testified were the responding officer, Officer Matthew Balard; the responding paramedic, Firefighter Keith Hipsley; two officers who spoke to her in the emergency room, Officer Dan Lane and Detective Robin Hayden; and Ward's mother, Gwendolyn Gonzalez. According to the testimony given by each of these people, Ward, either when asked or by her own volition, identified her attacker as Addison, by some combination of his first name, last name, nickname, or their relationship. Officer Lane, Firefighter Hipsley, and Detective Hayden all testified that Ward, at separate times to each of them, stated that she had been stabbed with an ice pick following an argument.

Several days after the altercation, Detective Hayden interviewed Ward. Detective Hayden took notes of Ward's statement, which was signed on each page by Ward. In the statement, Ward described the events of the day leading up to the attack. Ward told Detective Hayden that she had attempted to end her relationship with Addison earlier in the day. Addison's response was hostile, and included threats to Ward's life. According to Ward's statement and the testimony of her mother, Addison returned to Ward's home late on the evening of July 11, 2007, called for Ward, and eventually ended up walking around the neighborhood with Ward. During the walk, Ward told Addison that she did not want to be with him anymore. After walking away, Addison expressed his dismay, pulled out an ice pick, grabbed Ward by the hair, and began stabbing her repeatedly. While stabbing Ward, Addison said: "I will kill you . . . won't nobody else have you." Ward told Detective Hayden that Addison only stopped because of the arrival of the two eyewitnesses. Ward stated that Addison then went to pick up his belongings, said "I am not finished with you," and stabbed Ward two more times in the head before walking away. This statement is consistent with the testimony of the eyewitnesses and Ward's statements to others immediately following the attack.

Approximately two months after the attack, Ward stopped cooperating with the police and prosecution. About the same time, Ward wrote a letter to a judge on the Circuit Court for Montgomery County, detailing what had "really" happened, as well as her motive for falsely accusing Addison. In the letter, Ward stated she was actually attacked by a drug dealer named "Manny," from whom she had tried to buy drugs in exchange for sexual favors. Ward said that the drug dealer attacked her when she received the drugs and attempted to skip out on her part of the deal. According to Ward, "Manny" hit her "once or twice" with a beer bottle, with Addison coming to her rescue. In the letter, which was introduced at trial, Ward outlined various reasons why she had falsely accused Addison, such as wanting to punish him for cheating on her. Ward also detailed the outside pressures she felt, including embarrassment for "tricking for drugs," an unspecified fear of "Manny," and pressure from police and prosecutors to testify, fearing that her children would be taken away if she did not implicate Addison. Ward explained that she recanted her original story after realizing the gravity of the charges against Addison, which resulted from a "lie." In addition, Ward stated that she wanted to stop using drugs, in an attempt to rebuild her life.

At trial, Ward's testimony mirrored the letter she wrote in an attempt to shift the blame from Addison. Ward testified that she and Addison had been "getting high all day," in addition to being on a several day drug binge. Ward also testified that the argument between her and Addison arose from her desire to obtain more crack cocaine. She recounted her interaction with Manny, as well as her fear of him, and stated that Addison argued with Manny, eventually coming over to help her. While doing so, however, Ward testified that Addison was "cussing, and fussing" at her for being a "trick." Though Ward's memory of the attack was, at times, vague or incomplete, she remembered telling Addison to leave as "he was fussing." Ward testified to not having a recollection of speaking to police or paramedics at the scene, and

recalled only that she had a head wound, cuts to her arm, and had cocaine in her system.

With regard to why she told authorities and family she had been attacked by Addison with an ice pick, she stated that she was high, scared, and nervous. Again, she reiterated her fear of Manny, about whom she was unable to provide details. Ward also stated that she was angry at Addison for calling her names and blaming her during the attack, and she was embarrassed about prostituting herself for drugs. Ward also testified that some of her injuries were caused by coat hangers, stemming from her drug abuse. She stated:

[Ward]: I had got these things earlier. These, this poke, and this one here was not from that, that was from earlier.

[State]: From not from what? Not from what, Ms. Ward?

[Ward]: It wasn't from the incident with Nat.

[State]: What incident with Nat?

[Ward]: And Man.

The State's final witness was Hannah Sassoon. During pre-trial discovery, the State named Sassoon as a witness, intending to call her to testify as to "why victims of domestic violence recant and/or why the victims of domestic violence are uncooperative with law enforcement and/or the prosecution of their abuser." Before Sassoon was called to testify, defense counsel objected to her potential testimony, stating: "I would object to her testifying as to which is set out in discovery." The following exchange followed:

[Court]: What is the field of expertise and the expert testimony that is going to be offered?

[State]: Domestic Violence

[ . . . ]

[Court]: And the opinion that she is going to offer is?

[State]: She will not be offering any opinion. She will be providing testimony regarding her experience with domestic violence victims, testifying on issues in her 18 years of experience, . . . she would testify about women who have been battered by their domestic partners don't talk about

their experiences freely. She will talk about the common characteristics of battered women, their likeliness to come forward, their reluctance to participate with law enforcement and the reasons why, the commonalities of staying with their abuser.

We have testimony in this case that Ms. Ward has recanted ... that she is in contact with Mr. Addison, both in person and over the telephone, that she plans to marry him, that she is in love with him, and I think that is an area that the jury should hear is all to [sic] common and the reasons why it is all too common with victims of domestic violence.

[Court]: She's going to testify generally as to characteristics of battered women?

[State]: Yes, sir. She's never met Ms. Ward, [h]as never spoken with Ms. Ward. I must say, I'm not going to ask her anything about the case ... I think her testimony will be very helpful for the jury in reaching a decision about the ultimate issue in this case, which is agency.

[ ... ]

[Court]: All right. I'll permit it.

[ ... ]

[Defense counsel]: Please note my continuing objection to the testimony of this witness.

Sassoon was then called to testify, extensively explaining her work experience with domestic violence for the Sheriff's office, among others, and noting her Masters degree in History. The State then moved to have Sassoon qualified as an expert in the field of domestic violence. Defense counsel declined the opportunity to question Sassoon, and the court received her as an expert over the objection of the defense. The State then proceeded to ask Sassoon questions regarding specific aspects of her experience and characteristics of domestic violence victims. In response to those questions, Sassoon explained the characteristics of victims of domestic violence as varied, with the common ones being unwillingness to testify, changing stories, ambivalence, low self-esteem, and others consistent with "Symptoms Syndrome." Sassoon was

also asked about victims staying with their abusers, which, she replied, was a common phenomenon. Further, Sassoon discussed a "drama triangle," where victims try to "rescue" their abusers from "perpetrators," such as the police. The State asked Sassoon 11 questions along these lines, and defense counsel objected to each question. There was no cross-examination of Sassoon.

Additional facts will be supplemented below, as needed.

### Discussion

Addison argues that, for two reasons, the court erred in admitting Sassoon's testimony: 1) her expert testimony did not meet the *Frye/Reed* standard; and 2) her testimony lacked foundation under Maryland Rule 5–702. Addison further argues that the error was prejudicial and not harmless, as Ward's credibility was central to the trial. Meanwhile, the State argues that Addison's claim is not preserved, as no *Frye/Reed* hearing was requested, nor was any objection made to the foundation or relevance of Sassoon's testimony at trial.

### I. The testimony

At the outset, we categorize and reframe the testimony from which the errors are alleged. Before being called to the stand, the State proffered Sassoon as a witness regarding domestic violence. Domestic violence, though not defined at trial, is defined by Merriam–Webster's Dictionary as: "the inflicting of physical injury by one family or household member on another; also, a repeated or habitual pattern of such behavior." *See also* BLACK'S LAW DICTIONARY 1601 (8th ed. 1999) ("Violence between members of a household, usu. spouses; an assault or other violent act committed by one member of a household against another."). Despite the State's assertion at trial that Sassoon would not be offering any opinion regarding domestic violence, the State tendered Sassoon as an expert to the court, offered defense counsel an opportunity to voir dire, and the court accepted her as an expert. The State's subsequent proffer to the court clearly outlined opinion

testimony that was to be made by an expert. Her testimony was an opinion on the topic.

Maryland Rule 5–702 states:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) *whether a sufficient factual basis exists to support the expert testimony.*

(Emphasis added).

At trial, when Sassoon's testimony was proffered, the State acknowledged that she had never spoken to any of the witnesses, and that Sassoon's testimony was not based on any facts relating to Ward, nor did she even know Ward. Then, during oral argument before this Court, the State suggested that Sassoon's reference to opinion was the general concept of opinion, rather than the legal term of art. The record is clear, however, that the State proffered the testimony as expert opinion and the trial court treated it as such. Thus, we shall do the same.

## II. Preservation

The claims of error in this case must begin—and essentially end—with the issue of preservation. We first address the issue of whether defense counsel preserved his objections. If he did not, we will decline to examine the alleged errors. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court.").

The Court of Appeals addressed the proper method of making objections in *Kang v. State,* 393 Md. 97, 119–20, 899 A.2d 843 (2006):

Maryland Rule 4–323 sets forth the method of making objections to the admission of evidence in criminal trials. Maryland Rule 4–323(a) states, in part, that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." This is referred to as the contemporaneous objection rule. *See, e.g., Southern Management Corporation v. Taha,* 378 Md. 461, 499, 836 A.2d 627, 649 (2003) (Citations omitted). We recognized in some older cases that "[t]o preserve an issue on appeal in regard to the admissibility of evidence, generally speaking there must be an objection made to the question eliciting the allegedly objectionable answer." *Rose v. State,* 240 Md. 65, 69, 212 A.2d 742, 744 (1965) (Citations omitted). Moreover, "[g]enerally speaking, specific objection should be made to each question propounded, if the answer thereto is claimed to be inadmissible." *State Roads Comm. v. Bare,* 220 Md. 91, 94, 151 A.2d 154, 156 (1959). Yet, as the Court of Special Appeals noted in its opinion here, *Kang,* 163 Md.App. at 44, 877 A.2d at 185, "trial advocates were oftentimes obligated to lodge repetitive and disruptive objections, over and over again, even though everyone in the courtroom knew that the objections were going to be overruled."

Consequently, Maryland Rule 4–323(b), adopted in 1984, was created to provide a trial judge with the discretion to grant a continuing objection and thus obviates the need to object persistently to similar lines of questions that fall within the scope of the granted objection: "At the request of a party or on its own initiative, the court *may grant* a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope."

(Emphasis in original).

*A. The objections*

Addison objected generally to the testimony of Sassoon proffered by the State in discovery. The State argues that

this objection, which "is not the model of clarity," was an objection to the qualifications of the expert, and appeared to be treated by the trial judge as such. Thus, any challenge to scientific validity or lack of foundation is unpreserved, as when grounds are articulated, appellate review "is limited to the ground assigned." *Colvin–el v. State,* 332 Md. 144, 169, 630 A.2d 725 (1993) (citation omitted).

Addison's argument, that the issue is preserved because he made a general objection, does have some support. In *Hood v. State,* 334 Md. 52, 56, 637 A.2d 1208 (1994), the Court of Appeals held that, although "[t]he defendant did not state a specific reason for his objection ... the general objection he interposed was sufficient." Thus, "while not a model of clarity," the objection was sufficient to preserve issues as a general objection. *See Johnson v. State,* 408 Md. 204, 223, 969 A.2d 262 (2009) (a party basing an appeal on a "general" objection to admission of certain evidence, may argue *any* ground against its admissibility) (citations omitted) (emphasis in original).

Secondly, upon the court's ruling to allow the testimony of Sassoon, Addison requested a "continuing objection to the testimony of this witness." Pursuant to Maryland Rule 4–323(b), continuing objections may be granted to a line of questions, but they are "effective only as to questions clearly within [their] scope." Again, it is not clear as to which line of questioning and on what grounds defense counsel objected, thereby potentially leading to the paradoxical result of a continuing objection to a specific general line of questioning.

We are convinced, however, that the issue of Sassoon's testimony is preserved by the 11 separate general objections to the 11 questions asked during presentation of her expert testimony. The court did not ask for, nor did counsel volunteer, specific grounds for the objections, thus making them general objections. *See von Lusch v. State,* 279 Md. 255, 262–63, 368 A.2d 468 (1977). As a continuing objection is only effective as to questions clearly within the scope, the persistent objections to the testimony of Sassoon are clearly sepa-

rate general objections, allowing for any ground to be pursued, and therefore, preserved. In the usual case, these general objections are sufficient to preserve objection to the admissibility of evidence. Under the facts and circumstances of this case, however, general objections were not sufficient. We explain.

## B. Lack of Foundation

Addison argues that Sassoon's testimony was lacking sufficient foundation, and without proper foundation, was therefore irrelevant and inadmissible. Sassoon testified as to "Symptoms Syndrome" and "drama triangles," which both are substantially similar to the third phrase in Battered Spouse Syndrome.[2] Battered Spouse Syndrome is legislatively recognized as admissible evidence allowable by a court under certain circumstances, without need for further analysis. *See* Md.Code (1973, 2006 Repl.Vol.) § 10–916 of the Courts & Judicial Proceedings Article ("CJP") ("the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense ... [e]xpert testimony on the Battered Spouse Syndrome"). Evidence regarding Battered Spouse Syndrome is

---

2. The Court of Appeals has discussed at length Dr. Lenore Walker's description of what she called "battered woman syndrome." Dr. Walker, an academic and clinical psychologist, is usually credited with the first description of battered spouse syndrome. *State v. Smullen*, 380 Md. 233, 253–57, 844 A.2d 429 (2004) (citing Lenore E. Walker, THE BATTERED WOMAN (1979)) (additional citations omitted). Dr. Walker identified three phases in the "battering cycle," which can vary in time and intensity. *Smullen, supra,* 380 Md. at 253, 844 A.2d 429. Phase I is the "tension-building phase," in which the batterer begins to express hostility toward the victim and minor incidents of physical, sexual or emotional abuse occur. *Id.* (citations omitted). In Phase II, a serious battering incident occurs, in which the batterer "typically unleashes a barrage of verbal and physical aggression that can leave the woman severely shaken and injured." *Id.* at 254, 844 A.2d 429 (citations omitted). Phase III is a "contrition stage," in which the batterer "apologizes, seeks forgiveness, and promises to change." *Id.* This perceived transformation of the batterer into a loving partner "provides the positive reinforcement for remaining in the relationship." *Id.* (citation omitted). *Smullen* makes clear that *Frye/Reed* is not needed for Battered Woman's Syndrome. *Id.* at 266, 844 A.2d 429.

admissible by statute when the victim of the abuse is the defendant. CJP § 10–916(a)(2).[3] This is not the case here as Ward, the victim of the abuse, was not on trial. Appellant contends that Battered Spouse Syndrome or not, the domestic violence Sassoon indirectly testified to, and to which the State directly linked this case, required repeated acts of violence. Addison argues that, because no evidence was offered regarding repeated acts of violence, but at best there was one act of violence, there was no foundation for the testimony offered. On the other hand, the State believes that Addison is using Maryland Rule 5–404(b), "evidence of other crimes, wrongs, or acts," both as a sword and a shield.

■ By presenting this argument, Addison tries to have his cake and eat it too. Defense counsel worked diligently and effectively at trial to keep any evidence, reference, or inference as to Addison's prior history of violence, against Ward or otherwise, out of the trial. During the testimony of Detective Hayden, reference was made to Addison's arrest warrant being served by the "repeat offender unit." Defense counsel moved for a mistrial stating, "it's very, very crucial to the defense that no mention of [Addison's] prior involvement with law enforcement be made." Defense counsel additionally requested that the State "admonish all of its future witnesses not to make a reference[ ]" to Addison's prior criminal history. When it was Ward's turn to testify, the court admonished her not to mention any prior history of domestic violence. In addition, the State told the court that she had also warned

---

**3.** This section states:

   (a) *Definitions.*—(1) In this section the following words have the meanings indicated.

   (2) "Battered Spouse Syndrome" means the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the "Battered Woman's Syndrome".

   Whether the testimony of Sassoon truly relates to Battered Spouse Syndrome is not the question before us, and this opinion should not be read as expanding or interpreting CJP § 10–916(a)(2).

Ward not to make any reference to their prior history, lest they would "have to start the trial all over again."

■ To now come to this Court and claim error in the lack of foundation is disingenuous at best. By diligently working to keep evidence out, Addison effectively waived his right to object to lack of foundation. Had the objection been articulated at trial as a lack of foundation, a different result may have come about. *See DeLeon v. State,* 407 Md. 16, 25, 962 A.2d 383 (2008) (Where an objection was treated by the court as being on one ground, and ruled upon as such, arguments on appeal based on other grounds are waived.). The diligence in keeping out prior acts of domestic violence acted as an implicit stipulation to the foundation for Sassoon's testimony. While it is true that foundational facts are a necessary basis for expert testimony, preventing certain facts from entering the record at trial, then contesting the lack of foundational facts on appeal based on a general objection, would lead to nonsensical results, forcing trial judges to become clairvoyant gatekeepers.[4] After being successful in keeping facts out of the trial, counsel for appellant did not even hint that he was using this as a basis to object to Sassoon's testimony. *See Hammersla v. State,* 184 Md.App. 295, 308, 965 A.2d 912 (2009) ("A defendant who creates error cannot obtain a benefit—a mistrial or reversal—from that error." (Citations omitted)); *Allen v. State,* 89 Md.App. 25, 43, 597 A.2d 489 (1991) (" 'Invited error' is the shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error." (Citations omitted)).

C. *Frye/Reed* Hearing

■ Addison argues in the alternative that Sassoon's testimony, to which he objected, should not have been permitted as it does not meet the standards of expert testimony set forth in *Frye/Reed. See Frye v. United States,* 293 F. 1013

---

**4.** Had defense counsel objected to the evidence of prior acts and the lack of foundation in an articulable fashion, the trial judge may have chosen to grant one motion or the other, forcing counsel to choose one strategic route.

(D.C.Cir.1923); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). The Court of Appeals in *Reed* adopted and interpreted the *Frye* standard for determining the admissibility of scientific evidence:

> "[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, . . . then expert testimony based upon its validity cannot be admitted into evidence."

*State v. Baby,* 404 Md. 220, 268, 946 A.2d 463 (2008) (quoting *Reed, supra,* 283 Md. at 381, 391 A.2d 364). Were a *Frye/Reed* hearing held at the trial level, we would review the record and independently apply the *Frye/Reed* test de novo. *Wagner v. State,* 160 Md.App. 531, 547, 864 A.2d 1037 (2005) (citing *Wilson v. State,* 370 Md. 191, 201, 803 A.2d 1034 (2002)). A review of testimony admitted by the court is not limited to review on the record, but rather " 'can and should take notice of law journal articles [and] articles from reliable sources,' " as well as " 'judicial opinions which have considered the question, and the available legal and scientific commentaries.' " *Clemons v. State,* 392 Md. 339, 364, 896 A.2d 1059 (2006) (quoting *Wilson, supra,* 370 Md. at 201, 803 A.2d 1034 and *Reed, supra,* 283 Md. at 399, 391 A.2d 364).

Addison contends that we should review the testimony offered by Sassoon and subject it to the *Frye/Reed* analysis. If Addison believed that Sassoon was offering an expert opinion requiring such a hearing, he should have requested that hearing prior to trial. *See Clemons, supra,* 392 Md. at 346–47 n. 6, 896 A.2d 1059 (noting that the best practice regarding challenges to evidence based on *Frye/Reed* is to hold the hearing outside the presence of the jury and prior to trial).[5]

---

5. We explained in *Terumo Med. Corp. v. Greenway,* 171 Md.App. 617, 630, 911 A.2d 888 (2006), under a different factual scenario, why a *Frye–Reed* challenge is required:

The only pre-trial motion or hearing on this issue was held to keep out the evidence of Addison's prior violent history and prior acts of domestic violence. Only when the testimony of Sassoon was offered was an objection to that type of testimony raised. Even then, the grounds for the objection were vague. No *Frye/Reed* analysis was requested, or even hinted to, at trial. While neither Addison's objection to, nor the State's explanation of, the testimony of Sassoon were "models of clarity," they clearly were not *Frye/Reed* tests or arguments.[6]

▆ Similar to a motion to suppress or a motion for severance, if no request for a *Frye/Reed* analysis is made, the issue is waived and is not subject to appellate review. There are no Maryland cases that have directly addressed this issue. There are cases that reviewed the propriety of admission following a *Frye/Reed* test. *See, e.g., Blackwell v. Wyeth,* 408 Md. 575, 580, 971 A.2d 235 (2009) (whether evidence should have been subjected to a *Frye/Reed* test); *Montgomery Mut. Ins. Co. v. Chesson,* 399 Md. 314, 317, 923 A.2d 939 (2007) (whether the denial to subject evidence to a *Frye/Reed* test was appropriate); *CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 186, 858 A.2d 1025 (2004) (whether the *Frye/Reed* test was applicable); and *Clark v. State,* 140 Md.App. 540, 579, 781 A.2d 913 (2001) (the denial of evidence following a *Frye/Reed* test). But, we have never subjected evidence to *Frye/Reed* when not conducted or requested at trial.

Several Maryland cases come close to addressing the issue. In *State v. Smullen,* 380 Md. 233, 844 A.2d 429 (2004), the

---

In terms of an expert's methodology, an opponent could, for the first time at the close of the entire case, raise a *Frye–Reed* challenge to a methodology's acceptance in the scientific community. A *Frye–Reed* challenge could trigger extensive legal argument, legal memoranda, and possibly additional testimony. Were the methodology not acceptable, after all, the expert opinion could not establish the conclusion based upon that methodology ... The result could be procedural pandemonium.

**6.** The actual testimony of Sassoon may have been exactly the type of social scientific evidence subject to *Frye/Reed*. But, without a *Frye/Reed* motion, we need not make this analysis.

Court of Appeals discussed whether expert testimony similar to battered spouse syndrome was appropriate. The issue in *Smullen,* however, was whether testimony referred to as "battered child syndrome" should be interpreted to be within the confines of statutory battered spouse syndrome, and thus subject to *Frye/Reed. Smullen, supra,* 380 Md. at 238, 266–68, 844 A.2d 429. That case turned on whether there was sufficient evidence to raise the issue, not on whether *Frye/ Reed* should have been applied, in the context of self-defense. By enacting CJP § 10–916, the General Assembly has made evidence relating to the Battered Woman's Syndrome admissible, under circumstances set forth in the statute. *Id.* at 266, 844 A.2d 429 (citation omitted). *Smullen* generalized that social "scientific" evidence is generally subject to a *Frye* analysis. *Id.* at 266–68, 844 A.2d 429. *Smullen* did not address the issue as to whether a *Frye/Reed* analysis should be addressed on appellate review, when none was requested at trial.

In *State v. Baby,* the appellant raised a similar question as to whether testimony of an expert as to "rape trauma syndrome" should have been subjected to a *Frye/Reed* analysis. *Baby, supra,* 404 Md. at 223, 946 A.2d 463. In that case, the Court of Appeals had already granted Baby a new trial on other grounds before discussing the question. *Id.* at 265–66, 946 A.2d 463. The threshold question in reviewing whether a *Frye/Reed* analysis was required, was whether the issue was preserved by a proper objection. *Id.* at 271, 946 A.2d 463. The Court in *Baby* delved into the issue of *Frye/Reed* analysis as guidance for the circuit court on remand, should such testimony be offered again. *Id.* at 266–71, 946 A.2d 463. Most notably, the Court concluded, "[w]e suggest that 'rape trauma syndrome' evidence should first be subjected to *Frye/ Reed* analysis, *were an appropriate objection interposed." Id.* at 271, 946 A.2d 463 (emphasis added).

In *Montgomery Mutual Insurance Co. v. Chesson,* the Court of Appeals remanded the case to the circuit court to hold a *Frye/Reed* hearing. *Chesson, supra,* 399 Md. at 333, 923 A.2d 939. *Chesson* differs, however, because in that case,

the trial court denied a motion in limine requesting that expert testimony be excluded. *Id.* at 319, 923 A.2d 939. A *Frye/Reed* test was specifically requested, but denied by the trial court as not being a proper test for the testimony to be provided. *Id.* at 322–23, 923 A.2d 939.

While Maryland has not needed to directly address this specific issue, several other states have, and all have come to similar conclusions. For example, the Supreme Court of Illinois held that failure to object to the underlying foundation admissibility of the testimony or to file a motion for an evidentiary hearing to determine its admissibility under *Frye* resulted in the "issue being forfeited on appeal." *Snelson v. Kamm,* 204 Ill.2d 1, 272 Ill.Dec. 610, 787 N.E.2d 796, 809 (2003). When faced with a substantially similar question, the Appellate Court of Illinois, Fifth District, held that "the plaintiff never made any objection to the foundation of the defendant's expert testimony *as novel scientific evidence* and never requested an evidentiary *Frye* hearing before the circuit court," and "[a]ccordingly, this issue was forfeited." *Jackson v. Seib,* 372 Ill.App.3d 1061, 310 Ill.Dec. 502, 866 N.E.2d 663, 675 (2007) (emphasis added).

In *Hadden v. State,* 690 So.2d 573, 580 (Fla.1997), the Florida Supreme Court indicated that, "only upon proper objection that the novel scientific evidence offered is unreliable that a trial court must make this determination." Furthermore, "[u]nless the party against whom the evidence is being offered makes this specific objection, the trial court will not have committed error in admitting the evidence." *Id.* (citation omitted). In discussing the requirement of a proper/specific objection, the Florida court cited a previous Florida case, *Glendening v. State,* 536 So.2d 212 (Fla.1988), finding that, when objections are made to expert testimony based on other grounds, review on the basis of *Frye* could not be considered. *Id.* In other words, "[r]eversal of the trial court is not authorized on the basis of an evidentiary ruling that the trial court was never called upon to make." *Hunter v. State,* 202 Ga.App. 195, 413 S.E.2d 526, 529 (1991). Thus, in the absence of a specific objection, the issue is deemed to have been waived.

Further, in *Trach v. Fellin*, 817 A.2d 1102, 1123 (Pa.Super.2003), the Superior Court of Pennsylvania stated that the party seeking to prevent the admission of scientific evidence under *Frye* bears the burdens of production and proof. The court directed that trial courts should deny the motion without a hearing unless the moving party has presented and supported a prima facie case that the evidence is not generally accepted. *Id.* In addition, "the party seeking to bar evidence under *Frye* must identify precisely what is arguably not generally accepted about the expert's opinion." *Id.* at 1125 (citation omitted).

■ Finally, even failure to raise constitutional issues at trial can lead to those issues being waived upon appeal. *Robinson v. State*, 410 Md. 91, 106, 976 A.2d 1072, 1081 (2009) (citing *Taylor v. State*, 381 Md. 602, 626–27, 851 A.2d 551 (2004) (applying Md. Rule 8–131(a) and holding that the petitioner's claim of a double jeopardy violation was not preserved for appellate review because it was not raised at trial). In *Robinson*, the Court held that the right to a public trial can be waived by a failure to lodge a contemporaneous objection at trial. *Id.* at 108, 976 A.2d at 1082. The Court noted that "most rights, whether constitutional, statutory or common-law, may be waived by inaction or failure to adhere to legitimate procedural requirements." *Id.* at 107, 976 A.2d at 1082 (quoting *State v. Rose*, 345 Md. 238, 248, 691 A.2d 1314 (1997)).

Here, the issue of a *Frye/Reed* test or analysis was not raised at all until appeal; accordingly, we decline to consider the issue, as failure to request a *Frye/Reed* hearing waives the right to appellate review. Having failed to properly object, Addison's issues were not preserved and will not be considered by this Court.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**